OPINION OF THE COURT
Fuchsberg, J.
The pivotal point on this appeal is whether, under the facts and circumstances of this action for breach of a construction contract, it was reversible error, in the face of a “no-damage-for-delay” exculpatory clause, for the trial court to refuse to charge that the contractor could not recover for delays allegedly caused by the contractee, the City of New York, unless these were actuated by bad faith and deliberate intent. The exculpatory clause, article 13 of the contract, reads as follows: “The Contractor agrees to make no claim for damages for delay in the performance of this contract occasioned by any act or omission to act of the City or any of its representatives, and agrees that any such claim shall be fully compensated for by an extension of time to complete performance of the work as provided herein”.
*381 In a strenuously contested trial, the plaintiff, Kalisch-Jarcho, Inc., the successful bidder, at $8,033,000, for the heating, ventilating and air-conditioning component in the construction of the new New. York City police headquarters, offered proof calculated, essentially, to convince the jury that the progress of its work was subjected to drastic and costly delays which stretched out the time for the job’s completion, originally fixed at 1,000 consecutive calendar days, for an additional 28 months.[1] Attributing this solely to the city’s “endless” revisions of scores of plans and drawings, to its failure to co-ordinate the activities of its prime contractors, of which plaintiff was one of four, and to other acts of omission or commission interfering with the sequence and timing of the work, Kalisch sought $3,311,960 in damages.[2]
On trial, it was at Kalisch’s specific request that the jury was instructed that, notwithstanding the exculpatory clause, to bring in a verdict for the plaintiff it would have to find no more than that “the delay was caused by conduct constituting active interference”. Relevant also is Kalisch’s position that the right" to challenge the correctness of this charge was not preserved for our review.
The city, in defense, also raised issues of fact and of law. Contending that the delays were well within the contemplation of the parties, it presented evidence on which, among other things, it was possible to hold that, at the time of the bidding, the plaintiff knew that many of the drawings still were incomplete and so entered into the contract with eyes open. Moreover, the city attempted to show that the delay in any event was either greatly exaggerated or not of its making. From Kalisch’s own partial payment requisitions, it argued, for instance, that 97.4% of this contractor’s work was complete fully nine months before the formal completion, only routine punch list items remaining open thereafter. The city also relied on the fact that for a considerable period an industry-wide strike *382 immobilized the project. But, above all, by way of affirmative defense, it relied on the exculpatory clause, the thrust of which, in its view, was to insulate it from any finding of delay based on less than “bad faith and deliberate intent”.
In this context, the jury rendered a general verdict for the plaintiff in the sum of $806,382 to cover “delay damages [including claims of] subcontractors”, whose separate damage assertions had been incorporated into the Kalisch complaint. The verdict took the form of a response to the last of a series of interrogatories drafted by the Trial Judge and, after some hesitancy by the city’s counsel, submitted to the jury by consent of the parties. Important too is the jury’s affirmative answer to the interrogatory which asked whether “the delay, interference or obstruction” was within the contemplation of the parties at the time the contract was made. In addition, other replies placed responsibility for the delay on both parties and then placed 63% of the blame on the city and 37% on Kalisch. And, by its answer to an interrogatory cast in language conforming to the Judge’s charge, the jury further affirmed that the delay or obstruction caused by the conduct of the city constituted “active interference”.
Judgment on the verdict, inclusive of interest, having been entered in the sum of $949,645.35, the city took an appeal to the Appellate Division, which affirmed without opinion. Because, on our examination of the record, we find that the correctness of the trial court’s “active interference” charge was saved for our consideration, and, in our view, a stricter standard is required, the order of affirmance cannot stand. Our reasons follow.
Preliminarily, as to preservation, Kalisch’s presentation is two-pronged. First, it argues that the city failed to note its exception to the charge and, second, that, assuming it had, the city in effect waived any error by acquiescing in the form of the interrogatories, which, as afore-mentioned, contained a question parroting the “active interference” charge. We find neither ground persuasive.
In essence, CPLR 4110-b provides for the filing of written requests to charge, for the court’s informing counsel of its rulings and, when adverse, for counsel to have an opportunity for meaningful objection before the jury re *383 tires. On the specific matter before us now, the city in writing duly requested a charge that unless it be proved that the city “[had] acted in bad faith and with deliberate intent [to delay] the plaintiff in the performance of its obligation, plaintiff [could] not recover”. In so doing, it merely kept to the legal tack it had taken, unswervingly, from the beginning of the trial. For his part, the Trial Judge, when pressed on the same request at a charge conference, if less than explicit, left no doubt of his intention to tell the jury no such thing. For, not only did he state, “I’m not going to use the word ‘intent’ ”, explaining in the process that “An intent is an important ingredient in a crime”, but went on to add, “In fact, the City of New York may have done certain things with all the good intention in the world and committed a wrong.”[3] Moreover, after the court acted on this communication by charging the “active interference” formulation, when counsel began to intone each of his earlier objections, the court interrupted to assure him that all written requests had been studied and, in the interest of time, could be deemed adequately protected by blanket exception. In light of the court’s elaboration of its ruling, the denial of the city’s request had the earmarks of an “irrevocable” decision (Meagher v Long Is. R. R. Co., 27 NY2d 39, 46). In this perspective, counsel’s desistance from continuing his ad seriatim recitation must be taken fairly as acceptance of the court’s suggestion.
Nor was the city’s ultimate acquiescence in the query as to whether there had been “active interference” a waiver of its underlying contention. The Trial Judge already had ruled that he would submit the case on the contractor’s rather than the city’s legal theory. The interrogatory in question was but a mechanism by which the jury was to say whether there was enough credible proof to support that theory. At this purely procedural juncture, to require a rote refrain of an objection so “clearly made and overruled” would have been superfluous (Kulak v Nationwide Mut. Ins. Co., 40 NY2d 140, 145).
*384 Turning then to the exculpatory clause, we at once note that it is cast in language which on its face, tersely it is true, but clearly, directly and absolutely, states the contractor’s agreement to make no claims for delay damages caused by any act or omission to act by the city. Such a provision, not uncommon in construction contracts, especially when entered into at arm’s length by sophisticated contracting parties, in this case between a large contractor and a large city, are enforceable. When inserted at the behest of public agencies, restrained as these almost always are by limited financial authorizations, the object of such a clause is not only the usually ascribed avoidance of “vexatious” litigation as to whether delays are reasonable or unreasonable or, for that matter, real or fancied, but also, hopefully, to discourage dilatoriness itself (e.g., Mack v State of New York, 122 Misc 86, 88, affd 211 App Div 825; Psaty & Fuhrman v Housing Auth. of City of Providence, 76 RI 87, 93; Christhilf v Mayor & City Council of Baltimore, 152 Md 204, 208-209; Siefford v Housing Auth. of City of Humboldt, 192 Neb 643, 654-655).
As is true of contracts generally, implicit in the present one was the obligation of fair dealing (see Van Valkenburgh, Nooger & Neville v Hayden Pub. Co., 30 NY2d 34, 45; People ex rel. Wells & Newton Co. v Craig, 232 NY 124, 144; Restatement, Contracts 2d, § 205). Even absent an exculpatory clause, this very well may have rendered the contractee’s reasonably created delay acceptable. The clause here, therefore, might have little purpose if it were not read to extend acceptability to a range of unreasonable delay as well. Manifestly, this interpretation is mandated by the clause’s “unmistakable intent” that, as between these parties, the contractor rather than the contractee is to absorb damages occasioned by contractee-caused delay. For apt is the statement that public policy is not undermined by a frank recognition of such a perfectly common and acceptable business practice, by which an entrepreneur may provide protection against its own fault.
But an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly *385 negligent acts (cf., e.g., Gross v Sweet, 49 NY2d 102, 106, with Ciofalo v Vic Tanney Gyms, 10 NY2d 294, 297; see, generally, 15 Williston, Contracts [3d Jaeger ed], § 1750A; 5 Corbin, Contracts, § 1068; Restatement, Contracts 2d, § 195).
More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious[4] or prompted by the sinister intention of one acting in bad faith.[5] Or, when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit (Matter of Karp v Hults, 12 AD2d 718, affd 9 NY2d 857).
In either event, the policy which condemns such conduct is so firm that even when, in the context of the circumstances surrounding the framing of a particular exculpatory clause, it is determined, as it was by one of the interrogatories here, that the conduct sought to be exculpated was within the contemplation of the parties, it will be unenforceable (see Peckham Rd. Co. v State of New York, 32 AD2d 139, 141-142, affd 28 NY2d 734; Johnson v City of New York, 191 App Div 205, affd 231 NY 564).
It was against the background of these policies and principles that, as summarized above, the claim against the city centered on the extraordinarily long delay, the immense number of drawing revisions with which Kalisch was confronted and the failure to co-ordinate the contractors. By attributing all of this to the misconduct of the city, even absent any evidence of malice, Kalisch’s proof, if credited, would have to establish that the city’s conduct amounted to gross negligence.[6]
*386 To support such a conclusion, however, the jury would have to find more than “active interference”, which, incidentally, was not a contract term.[7] For whether conduct is “active” or “passive” does not determine wrongdoing, and “interference”, which most commonly translates as “intervention” (Webster’s International Dictionary [2d ed, 1950], at p 1294), does not connote willfulness, maliciousness, abandonment,[8] bad faith or other theories through which runs the common thread of intent. So, taken at face value by the jury, the charge was calculated to expose the city to liability for conduct within the umbrella of the exculpatory clause. Accordingly, although the request to charge perhaps could have been more precisely put, the city, at the very least, was entitled to the amplifying instruction that unless Kalisch-Jarcho proved that “the City acted in bad faith and with deliberate intent delayed the plaintiff in the performance of its obligation”, the plaintiff could not recover.[9]
For all these reasons, the order of the Appellate Division should be reversed, with costs, and a new trial granted.

. Though the contract was awarded to and performed by Jarcho Bros., Inc., its affiliate, Kalisch-Jarcho, Inc., is the plaintiff in this action. The parties have raised no question concerning the seeming discrepancy. We therefore treat Kalisch-Jarcho, Inc., as the contractor for the purpose of this opinion.

. In addition, it was to collect $1,854,782 for change orders, none of which it credits to the delay.

. Indeed, spelling out his personal, albeit nondeterminative, reaction to the proof, in his preceding two sentences, the Judge, though not the fact finder, remarked, “I don’t believe the City of New York had the intent to stop him. I think the City of New York was desirous of pursuing the work as diligently as possible”.

. Malice, in law, is a state of mind intent on perpetrating a wrongful act to the injury of another without justification (Jestic v Long Is. Sao. Bank, 81 AD2d 255, 257).

. Bad faith, the mirror image of good faith, connotes a dishonest purpose (cf. Uniform Commercial Code, § 1-201, subd [19] [“good faith” defined as “honesty in fact”]).

. In its brief on this appeal, Kalisch in part now argues that “the City’s failure to disclose [that the contract drawings were defective] coupled with its positive misrepresentation of the facts at the pre-bid meeting, amounted to actual or constructive fraud”. Intent is, of course, an essential element of fraud. But, even if one were to assume that *386 such an inference can be drawn from the record, there was no request that such a theory, which would have been within the realm of willful misconduct, be charged to the jury. Concomitantly, there is nothing in the interrogatories to suggest that such a claim was to be considered.

. “Active interference” is merely one of the several expressions which courts have used in discussing a broad range of willful wrongdoing beyond the sufferance of an exculpatory clause (e.g., Cauldwell-Wingate Co. v State of New York, 276 NY 365, 375 [“misrepresentation”]; Wright & Kremers v State of New York, 238 App Div 260, mod 263 NY 615 [“abandonment”]; Taylor-Fichter Steel Constr. Co. v Niagara Frontier Bridge Comm., 261 App Div 288, affd 287 NY 669 [“unlawful interference”]; Norman Co. v County of Nassau, 27 AD2d 936 [“willful interference”]; Ippolito-Lutz, Inc. v Cohoes Housing Auth., 22 AD2d 990 [“refusals * * * to perform”]). Therefore, stare decisis, so vigorously defended by the dissent, is inapropos. Indeed, far from contributing to stability in the law, affirmance here could result in the realization of the danger warned of over 40 years ago — that a plaintiff, having waived its right to claim damages caused by delay, be able to “recover such losses by the more expediency of terming this delay ‘[active] interference’ ” (Taylor-Fichter Steel Constr. Co. v State of New York, 261 App Div, at p 295).

. Abandonment connotes relinquishment with the intention of never resuming the interest relinquished (see Foulke v New York Consolidated R. R. Co., 228 NY 269, 273).

. Since there will be a new trial, we comment briefly on two other issues. The first relates to section 343a-1.0 of the Administrative Code of the City of New York, which reflects a city policy that when the cost of changes on a building project has exceeded 5% of the original cost, further changes require Board of Estimate approval; in no way did this authorize an instruction that change orders in excess of 5% are excessive vis-a-vis *387 contractors. The second, relating to article 12 of the contract, which in substance provides, in a clause to be found in each prime contractor’s agreement, that when the act or omission of another contractor is responsible for any damage, the contractor affected thereby must proceed against the offending contractor and “shall have no claim against the City”; there was no prejudice in the Trial Judge’s refusal to charge this provision since this case was presented essentially on the theory that the city itself caused the delay.