**T.P.K. CONSTRUCTION CORPORATION,**
Plaintiff,

v.

**SOUTHERN AMERICAN INSURANCE COMPANY and Massachusetts Insurance Agency, Inc., Defendants.**

**SOUTHERN AMERICAN INSURANCE COMPANY, Third–Party Plaintiff,**

v.

**Timmy KOUSTAS, Artemis Koustas, Metropolitan Bond Corp., and Joseph Starr, Jr., Third–Party, Defendants.**

**No. 89 Civ. 8415 (RPP).**

United States District Court,
S.D. New York.

Nov. 26, 1990.

---

Hollander & Groner, New York City by Larry Hollander, for plaintiff.

Bower & Gardner, New York City by Barry T. Bassis, for Southern American Ins. Co.

Bergadano, Zichello & Babchik, New York City by Vincent J. Zichello, for Massachusetts Ins. Agency.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Defendant Southern American Insurance Company ("Southern"), a Utah corporation with its principal place of business in Provo, Utah, moves for summary judgment on its counterclaim against plaintiff, TPK Construction Corporation ("TPK"), a New York corporation, and on its third-party complaint against TPK's President and sole stockholder, Timmy Koustas ("Koustas"), and his wife, Artemis Koustas, third-party defendants, based on a General Indemnity Agreement (the "Agreement") executed by TPK, Koustas and Southern.

For the past 15 years, TPK, a construction company, has been primarily engaged in public works projects on competitively bid contracts up to a value of $3.5 million.

In early 1988 third-party defendant Joseph Starr, Jr. ("Starr"), an employee or principal of third-party defendant Metropolitan Bond Corp. ("MBC"), told Koustas he wanted to act as TPK's broker to obtain bid and performance bonds (Deposition, 192–93).[1] Starr told Koustas he had found a bonding company, Southern, which could provide TPK with big bonds in the $5 to $10 million range (375–377). Koustas understood that Starr "worked for" defendant Massachusetts Insurance Agency ("MIA"), a Massachusetts corporation (383–84). Fireman's Fund Insurance Company ("Fireman's Fund"), which wrote bonds for TPK in 1988 and 1989, had limited TPK to $5 million per contract and, after September 1988, had limited bonds for simultaneous TPK projects to $13 million (450, 451–52). Koustas had been looking for about a year through Starr and Fleetwood Agency (another broker TPK had used) for an insurance company to write big bonds (378–80).

Thereafter, in November 1988, Koustas had a dinner meeting with Starr and Joseph Abbate of MBC and Victor Borcherds,

---

[1] Parenthetical numerals refer to pages of deposition testimony of Koustas, dated September 11, 18, 26, 1990.

President of Southern, concerning TPK's need for bid, performance and payment bonds in connection with its public works construction business. At the meeting, it was discussed that a substantial part of TPK's business was public works construction with New York City. Koustas Aff. of October 22, 1990, at 2. In November 1988, TPK also furnished a work history schedule to Southern which showed such a work concentration. Koustas Aff. at 3.[2]

In the first week of January 1989 Starr left a form of Southern's General Indemnity Agreement with Koustas. The Agreement is Southern's form agreement which is a pre-condition to Southern's executing bid, performance and payment bonds for construction companies. Koustas waited for about a week before he and his wife signed the Agreement before a notary public on January 9, 1989 (413–17). Koustas did not read the contract or discuss it with an attorney, but decided not to do so (417). Koustas had discussed a similar agreement with an attorney and had signed general indemnity agreements in the past for other bonding companies (415–16). Koustas did not discuss the Agreement with Starr or Southern (418). The Agreement contains several provisions which the parties assert are relevant to the outcome of this motion.

Under Section 2 of the Agreement, TPK and the Koustases are obligated to indemnify and hold Southern harmless from any losses and expenses, including fees and disbursements of counsel which Southern may sustain or incur "by reason of having executed any bond or bonds presently or hereafter applied for." Section 2 reads as follows:

> **Right of Surety to indemnification against: (a) Liability before payment of loss, (b) loss, (c) counsel fees and other expenses.** The Undersigned shall indemnify and keep the Surety indemnified against, and held harmless from, any and all liability for losses and expenses of whatsoever kind or nature, including the fees and disbursements of counsel, and

against all said losses and expenses, which the Surety may sustain or incur (i) by reason of having executed or procured the execution of any bond or bonds, presently or hereafter applied for, (ii) by reason of failure of the undersigned to perform or comply with the covenants and conditions of this agreement, (iii) in enforcing any of the covenants and conditions of this agreement, or (iv) in defending any action against .the Surety arising out of the execution of any bonds on behalf of the Principal or the Surety's exercise of any rights under this agreement, and the Undersigned will pay over, reimburse and make good to the Surety all sums and amounts of money which the Surety shall pay or cause to be paid or become liable to pay under any such instruments, or as charges and expenses of whatever nature or kind, including counsel fees, by reason of the execution of said instruments or in connection with any litigation, investigation or other matters connected therewith, such payments to be made to the Surety as soon as it shall become liable therefor, whether it shall have paid out any such sums or any part thereof or not.

Under Section 24 of the Agreement, Southern expressly does not agree to guarantee the acceptance of its bonds by any obligee named therein. Section 24 reads as follows:

> **Right of Surety to decline to execute bond.** That the Surety may regard a letter, telegram or written application signed by the Undersigned and addressed to the Surety or any of its agents as sufficient and ample authority for the Surety to execute the bond specified in such letter, telegram or written application, and any bond executed upon such authority shall be embraced in the Indemnity hereby given, but the Surety does not guarantee the prompt issuance of such bonds upon such request nor their acceptance by the obligee or obligees named therein, and reserves the right to decline to entertain any applica-

---

**2.** The work schedule is evidently Exhibit J to the Hollander Affidavit of October 22, 1990, which contains only pages 3–7.

tion or refuse to execute any bond of any kind or nature, and such declination shall not diminish or alter the liability that may arise by reason of having executed a bid or proposal bond.

Section 26 of the Agreement absolves the Surety from liability "arising out of any action taken, or any statements, verbal, written or otherwise, made in good faith by the Surety...." Section 26 reads as follows:

**Right of Surety to exercise rights under agreement without liability.** The Surety, its officers, directors, agents, servants, employees and attorneys, shall not be liable to the Undersigned for any damages or injuries that may be sustained by them, whatever kind or nature such may be, caused by or arising out of any action taken, or statements, verbal, written or otherwise, made in good faith by the Surety in exercising or attempting to exercise any of its rights or privileges under this agreement or under any other agreement between the Surety and any one or more of the Undersigned, or under law or in equity, or under or relating to any bonds executed by the Surety.

Section 29 of the Agreement requires the Agreement to be construed liberally in favor of the Surety. It reads as follows:

**Agreement to be construed liberally in favor of Surety.** This obligation shall be liberally construed so as to fully protect and indemnify the Surety.

After TPK and the Koustases executed the Agreement, Southern issued Bid Bonds for TPK for construction projects in Louisiana and New York, including the two Bid Bonds which give rise to this action. Those two Bid Bonds were for projects of the Parks Department of the City of New York (the "Parks Department"), the reconstruction of the Hamilton Fish recreation center, pool and park ("Fish Project") and the reconstruction of the Thomas Jefferson Park's bathhouse and pool ("Jefferson Project"). The two projects were to be completed simultaneously over a two-year period. TPK's bid on the Fish project was $9.4 million and the bid on the Jefferson Project was $5.4 million. The Bid Bonds were for 10% of TPK's bids on those projects.[3]

In March, 1989, TPK was found to be "apparent low bidder" on both the Fish Project and the Jefferson Project. Because on March 24, 1989 a bid review committee found problems with both bids, it stated with respect to both projects, "Do not award—Pending meeting with apparent lowest bidder. Check quantity on items...." Bassis Aff. of October 10, 1990, Exh. G. The committee found 26 potentially unbalanced items in TPK's bid on the Fish Project and two or three unbalanced items on the Jefferson Project. TPK was advised by a Parks Department letter dated March 24, 1989 to attend a meeting to demonstrate that its bid items were not unbalanced. Bassis Aff., Exh. H. However, before the meeting was held, the Parks Department on March 29, 1989 sent a letter to TPK notifying it that both bids were rejected because Southern was not authorized to do business in the State of New York as required by Section 8(a) of the standard Parks Department contract. The Parks Department's Information for Bidders ("IFB") with respect to each project stated that the bid performance and payment bonds must come from a surety company "authorized" to do business in the State of New York. Koustas Aff. at 3. Southern was not licensed by the Insurance Department of the State of New York to issue surety bonds in the State of New York, under Section 107(a)(10) of the New York Insurance Law. Southern's Answer, ¶ 8, ¶ 21. Koustas was aware of this requirement from other city contracts and knew that the IFB package required the surety to be authorized to do business in New York (344, 363).

TPK had not forwarded the IFB package to Southern (328–29, 344). Koustas has conceded that no one from Southern told him Southern was licensed in New York or where it was licensed (393, 397). The only persons who made such representations to Koustas were Starr and Abbate of MBC

---

**3.** Bid Bonds by their terms protect the City from a withdrawal by the low bidder.

(393, 403, 405, 406). It is undisputed that MIA billed TPK a flat $50 fee in connection with each of the Bid Bonds. Southern's Rule 3(g) Statement.[4]

Each of the Bid Bonds executed by Southern for the two projects were on a New York City bid bond form which refers to the IFB.[5] In connection with the Jefferson Project, Southern rewrote the bond on the city form due to a change in the price of TPK's bid and sent it directly to TPK, with a copy to MIA as broker, by covering letter requesting a copy of the contract if TPK was the low bidder. Koustas Aff., Exhs. A and B. Koustas states that Southern was on notice of the requirements of the IFB, Koustas Aff. at 3, but this conclusion of fact on his part is not supported by the factual allegations of his affidavit or by the supporting exhibits.

As a result of the rejection of the low bid on the Fish Project, it was rebid by the Parks Department three times. TPK did not bid since it was unable to obtain bonding from a licensed New York insurer (330). Fireman's Fund, which wrote other bonds for TPK, said this was "too big a job" for TPK (335). During his deposition, Koustas acknowledged that both projects were above the limits of any surety which had ever provided bonds to TPK (482–92, 494–95).

### The Pleadings

TPK's complaint alleges two causes of action against Southern and two against MIA. The first cause of action against Southern is for negligence in that Southern breached its duty of reasonable care to TPK by issuing a Bid Bond negligently and in violation of the insurance law and regulations of New York State. The third cause of action is also against Southern and is for breach of contract for its failure to provide bid, performance and payment bonds in conformance with the terms and conditions of the IFB because it was an unauthorized insurer.[6]

Southern's answer denies liability and contains a counterclaim alleging that due to the terms of the Agreement Southern is absolved from liability to TPK and is entitled to reimbursement for its expenses, including legal fees and disbursements in this action. The same claims are asserted by Southern against the Koustases in the third-party complaint filed by Southern. TPK's reply to the counterclaim and the Koustases' answer to the third-party complaint is that the Agreement is unenforceable because it is contrary to public policy and unconscionable, and that the indemnification provision of the Agreement was intended to protect Southern against third party claims and not those arising out of plaintiff's own claims.

By this motion for summary judgment, Southern seeks to invoke the Agreement as an effective bar to plaintiff's claims against it. The motion to dismiss plaintiff's first cause of action in negligence is granted. The remainder of Southern's motion is neither granted nor denied.

### DISCUSSION

To grant a motion for summary judgment a court must find that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law because, after sufficient time for discovery, the non-moving party has failed to make a sufficient showing of an essential element of its case as to which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also, Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The

---

**4.** In accordance with practice in the industry, the parties contemplated that Southern would bill all bond premiums to TPK upon issuance of its performance and payment bonds. Plaintiff's Rule 3(g) Statement. In its initial complaint, TPK had claimed that Southern was engaged in a scheme to collect premiums on bid bonds.

**5.** Pursuant to the Bid Bond the Surety agrees, subject only to the payment of premiums, to write performance and payment bonds in the form set forth in the contract documents if requested by the City, in the event the contract is awarded to the bidder.

**6.** On each cause of action, TPK requests $8 million in compensatory damages and $10 million in punitive damages.

burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and the Court will view the facts in the light most favorable to the non-moving party. *Meiri v. Dacon,* 759 F.2d 989, 997 (2nd Cir.1985), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

### The Negligence Claim

 The legal relationships and duties of the parties here have been established by the Agreement. Accordingly Southern cannot be held to a higher standard of conduct than that required under the Agreement unless plaintiff presents evidence of an independent duty of the defendant to plaintiff. The New York Court of Appeals has held that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island Rail Road Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (citations omitted). Interpreting New York law, a federal court has recently stated: "The mere fact that the alleged breach involved a contract that encompassed the performance of services does not suffice as special additional allegations of wrongdoing which amount to 'a breach of a duty distinct from, or in addition to, the breach of a contract.'" *Niagara Mohawk Power v. Stone & Webster Engineering Corp.,* 725 F.Supp. 656, 666 (N.D.N.Y.1989) (quoting *North Shore Bottling Co., Inc. v. C. Schmidt and Sons, Inc.,* 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968)). *See also, Key International Manufacturing, Inc. v. Morse/Diesel, Inc.,* 142 A.D.2d 448, 536 N.Y.S.2d 792 (1988); *Milau Associates v. North Avenue Development Corp.,* 42 N.Y.2d 482, 398 N.Y.S.2d 882, 368 N.E.2d 1247 (1977).[7] TPK has failed to show any independent duty which might justify holding Southern to a standard of conduct higher than that

envisioned by the Agreement. Although the negligence count of plaintiff's complaint does contain alleged violations of the Insurance Law, some of which may relate to Southern's possible liability under the Agreement, those allegations do not give rise to a separate negligence cause of action by a private party. *Cf. Buccino v. Continental Assurance Co.,* 578 F.Supp. 1518 (S.D.N.Y.1983). No private actions have been authorized by those statutes and regulations for violations thereof, *see id,* and plaintiff cites no contrary authority. Accordingly, plaintiff's first cause of action is dismissed.

### The Breach of Contract Claim

The Agreement constitutes a binding contract between Southern and TPK and the Koustases. It must be enforced in accordance with its terms. "Under general contract principles a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 845 (2nd Cir.1987). The plaintiff's arguments that the Agreement's terms were not negotiated and that indemnity agreements which are presented on a take it or leave it basis should not be binding are without merit. There is no evidence whatsoever of duress or fraud relative to the terms of the Agreement which would relieve TPK and the Koustases of its consequences. No one associated with Southern pressured TPK or the Koustases to sign the Agreement or even contacted Koustas about it. Southern's 3(g) Statement.

 This is not the exceptional case where a commercial contract may be found unconscionable and against public policy. *Credit Alliance Corp. v. Joshco Mining Corp.,* 90 F.R.D. 187, 189 (S.D.N.Y.1981). Plaintiff cites no authority for this claim contained in its reply to the counterclaim.

---

7. Indeed, plaintiff's claim is for lost profits and under New York law a party is not liable for lost profits unless the contract provided the party would assume such a heavy responsibility. *Kenford Company, Inc. v. County of Erie,* 73 N.Y.2d 312, 319–20, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989), *appeal dismissed,* 74 N.Y.2d 712, 543 N.Y.S.2d 393, 541 N.E.2d 422 (1989). These Bid Bonds contained no provision even implying such responsibility. By their terms, the Bid Bonds here provided assurance to the Parks Department, not TPK.

Although Section 2 of the Agreement by its terms is broad enough to hold Southern harmless even for its own acts of negligence, such agreements are valid and binding in New York. *Kurek v. Port Chester Housing Authority*, 18 N.Y.2d 450, 276 N.Y.S.2d 612, 223 N.E.2d 25 (1966); *Kalisch–Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983). *See also, Roberts v. Consolidated Rail Corp.*, 893 F.2d 21, 25 (2nd Cir.1989). Lastly, since Koustas acknowledges that he executed the Agreement without reading it, TPK is not in a position to argue that provisions of the Agreement were interpreted by him to have a meaning other than their plain meaning.

Southern points to the Agreement as unambiguous, relying on the following provisions: (1) the Surety would not guarantee the acceptance of any of its bonds by the obligees, Section 24, and (2) the Surety was to be indemnified and held harmless by TPK and the Koustases "for any and all losses and expenses, of whatsoever kind or nature," including counsel fees, sustained by the Surety by reason of having executed bonds for TPK, Section 2. Plaintiff takes exception to the scope of Southern's interpretation of the indemnification provision, submitting an affidavit by John D. Filice, a licensed New York State insurance broker since 1955 and President of Fleetwood Agency, Inc., New York City, stating that general indemnification provisions like Section 2 have been interpreted by him as holding the surety "harmless against third-party claims and not as a 'waiver' of any and all causes of action against the surety." Filice Aff., October 22, 1990, at 3.[8]

■ By its terms, this indemnity provision is not limited to third party claims.

General assertions relying on other general indemnity agreements not in evidence, such as Mr. Filice's affidavit, are not sufficient to cast doubt on the plain meaning of a provision in a contract. *Cf. Tokio Marine & Fire Insurance Co. Ltd. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2nd Cir. 1980).

Plaintiff argues that Southern cannot rely on the Section 24 provision that the "Surety does not guarantee the prompt issuance of such bonds upon request nor their acceptance by the obligee or obligees named therein," because its bonds were not issued in good faith, and thus violated the standard of conduct required by Section 26. It is true that Section 24 must be read in conjunction with the rest of the Agreement, including Section 26 of the Agreement. *Two Guys v. S.F.R. Realty Associates*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984). *Cf. American Home Products v. Liberty Mutual Insurance Co.*, 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2nd Cir. 1984) (a fundamental rule of construction "requires a court to construe the contract as a whole, and whenever possible to give effect to all of its parts"). In the Court's reading of Section 26, however, Southern is exempted from liability "for any action taken or statements ... made in good faith by the Surety in exercising ... any of its rights or privileges under this agreement." Southern's non-guarantee of an obligee's acceptance of its bonds, as provided in Section 24, does not involve an exercise of Southern's rights or privileges under the Agreement. Furthermore, TPK is not claiming that the indemnity and hold harmless provisions of Section 2 are being exercised in this litigation in other than good faith. It has not shown that Section 26

---

**8.** Plaintiff also argues that contracts made in violation of statutes are void. Plaintiff does not show how the Agreement violated any statute since non-licensed insurers can be used by excess lines brokers to write such insurance in New York. 11 N.Y.C.R.R. 27.0(a). Hollander Aff., Exh. A. Thus the Agreement is not void for that reason. If plaintiff's argument is based on the broadness of the hold harmless and non-guarantee provisions of the Agreement as being unconscionable, under New York law those provisions do not void the Agreement but are enforceable against the insurer under § 3103(a) of the New York Insurance Law.

Furthermore, the New York Court of Appeals has held that regardless of an insurer's non-compliance with New York law its policies are enforceable against the insurer. *Bersani v. General Accident Fire & Life Assurance Corp., Ltd.*, 36 N.Y.2d 457, 460, 369 N.Y.S.2d 108, 330 N.E.2d 68 (1975).

constitutes a limitation on Section 2. Accordingly, Section 26 is not applicable to these provisions.

■ Although the provisions of Section 26 do not modify the terms of Sections 2 and 24 relied on by Southern, under the law of New York an implied covenant of good faith and fair dealing does apply to Southern's conduct under the Agreement, including its issuance of bonds. *Kalisch–Jarcho,* 58 N.Y.2d at 384–85, 461 N.Y.S.2d 746, 448 N.E.2d 413 (regardless of the broadness of the terms of any agreement of non-liability, a covenant of fair dealing and good faith is implied). Under *Kalisch–Jarcho,* the New York Court of Appeals held that breach of the covenant of good faith and fair dealing required proof of 1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence. 58 N.Y.2d at 385, 461 N.Y.S.2d 746, 448 N.E.2d 413. Accordingly, Southern's defense based on Section 24 and Southern's claims under Section 2 for indemnification and attorneys' fees are valid unless plaintiff is able to show that there has been a breach of the covenant of good faith and fair dealing.

In support of its argument that Southern did not act in good faith, plaintiff first uses quotes from the Bid Bond form language (although not in context) to show that the Bid Bonds at issue expressly referred to the IFB, the proposed Contract and the bidder's proposal. Plaintiff's Memorandum of Law at 19–20. Solely on the basis of this language, plaintiff, in its counsel's words, seeks to cast doubts on Southern's claim that Southern was "not aware of these documents." Plaintiff's Memorandum of Law at 20. Such casting of doubt is not sufficient to withstand a motion for summary judgment.[9] Other than the Bid Bond form itself, Koustas has admitted that TPK sent nothing to Southern which would have apprised Southern of the requirements in the IFB or the Contract. TPK Response to Request No. 3 of Southern's First Request for Production of Documents. The Bid Bond form, a copy of which is attached as an appendix to the Opinion, does not apprise the reader of the requirements of the IFB or the Contract although it does apprise the reader that an IFB exists and a Contract will exist. Furthermore, Koustas has admitted he did not apprise Southern of the Parks Department requirement that all bonds be issued by an insurer licensed in New York. (328–29, 344). Plaintiff acknowledges that Southern would have obtained payments of premiums for the Bid Bonds only upon the issuance of a related performance and payment bond, Plaintiff's 3(g) Statement, Item 1, and plaintiff has failed to set forth any other possible motivation for Southern's actions herein which would give rise to a breach of the covenant of good faith and fair dealing. Under these circumstances, plaintiff has not raised a genuine issue of fact sufficient to show a breach of the implied covenant of good faith and fair dealing under *Kalisch–Jarcho* with respect to Southern's mere issuance of the Bid Bonds.

Plaintiff, however, argues that Southern did not act in good faith in performing under the Agreement because issues of fact exist as to whether or not Southern "could have written the instant bonds through even a surplus lines broker." Plaintiff's Memorandum of Law at 21. First it states its belief that Southern was not even qualified for such purposes on a nonadmitted basis/surplus lines basis, because on October 22, 1990, the Insurance Department of New York State confirmed that it had no record of EL–1 Form filings by Southern for the years 1988 and 1989.[10]

---

**9.** The Court is aware that insurers issue many bid bonds to insureds which do not result in the award of contracts, and that review of IFB's by an insurer, as opposed to review of IFB's by a broker, could be an inappropriate burden in business practice. A contract should be viewed as if by a reasonably intelligent business person who is familiar with the agreement and indemnity as a whole. *Walk–In Medical Centers v.*

*Breuer Capital Corp.,* 818 F.2d 260 (2nd Cir. 1987).

**10.** Plaintiff acknowledges that non-licensed insurers can write insurance in New York on an excess lines basis but cites 11 N.Y.C.R.R. 27.6(d) to show that in that event the insurer must file an EL–1 Form.

Second, based on Best's Insurance Reports, plaintiff does not believe Southern ever maintained proper reinsurance sufficient to issue the Bid Bonds in compliance with the New York Insurance Law and regulations. Plaintiff's Memorandum of Law at 23. Third, plaintiff does not believe that Southern maintained reinsurance sufficient to have issued the performance and payment bonds required under the anticipated contracts. Plaintiff's Memorandum of Law at 24. Fourth,[11] the Bid Bonds failed to carry a printed notice of an unlicensed insurer as required under 11 N.Y.C.R.R. § 27.7 and § 27.8. Regardless of whether plaintiff is able to prove the violations of insurance law it alleges, those allegations, under *Kalisch–Jarcho*, may not constitute a violation of the covenant of good faith and fair deal-

ing or may have been rendered irrelevant by the discovery conducted in the interim since this motion was argued.

Since the parties have not addressed the issue of whether or not Southern's conduct amounts to a breach of the implied covenant of good faith and fair dealing under *Kalisch–Jarcho*, the Court orders both parties to submit briefs to the Court on this issue, together with any affidavits that may be required to support their positions, no later than December 4, 1990. In light of the foregoing, all proceedings and discovery are stayed until a court conference on December 6, 1990, at 4 p.m. Plaintiff's first cause of action in negligence is dismissed.

IT IS SO ORDERED.

---

**11.** Plaintiff also argues that whether MIA acted as an agent of Southern or as a broker is an issue of fact, but does not show how this is relevant to the covenant of good faith and fair dealing issue in such a way as to limit the hold

harmless provision or the no guarantee provision.

## APPENDIX

### FORM OF BID BOND

KNOW ALL MEN BY THESE PRESENTS, That we, _____

_____

_____

hereinafter referred to as the "Principal", and _____

_____

_____

hereinafter referred to as the "Surety" are held and firmly
bound to THE CITY OF NEW YORK, hereinafter referred to as the
"CITY", or to its successors and assigns, in the penal sum of

_____

_____($_____)

Dollars, lawful money of the United States, for the payment of
which said sum of money well and truly to be made, we, and each
of us, bind ourselves, our heirs, executors, administrators,
successors and assigns, jointly and severally, firmly by these
presents.

WHEREAS, the Principal is about to submit (or has sub-
mitted) to the City the accompanying proposal, hereby made a
part hereof, to enter into a contract in writing for_____

_____

_____

NOW, THEREFORE, the conditions of this obligation are such
that if the Principal shall not withdraw said Proposal without
the consent of the City for a period of forty-five (45) days after
the opening of bids and, in the event of acceptance of the
Principal's Proposal by the City, if the Principal shall

(a) within ten (10) days after notification by the City,
execute in Quadruplicate and deliver to the City all the
executed counterparts of the contract in the form set forth in
the Contract Documents, in accordance with the proposal as
accepted, and

(b) furnish a performance bond and separate payment bond,
as may be required by the City, for the faithful performance
and proper fulfillment of such Contract, which bonds shall be
satisfactory in all respects to the City and shall be executed
by good and sufficient sureties, and

(c) in all respects perform the agreement created by the acceptance of said Proposal as provided in the Information For Bidders, bound herewith and hereby made a part hereof, or if the City shall reject the aforesaid Proposal, then this obligation shall be null and void; otherwise to remain in full force and effect.'

In the event that the Proposal of the Principal shall be accepted and the Contract be awarded to him the Surety hereunder agrees, subject only to the payment by the Principal of the premium therefor, if requested by the City, to write the aforementioned performance and payment bonds in the form set forth in the Contract Documents.

It is expressly understood and agreed that the liability of the Surety for any and all claims hereunder shall in no event exceed the penal amount of this obligation as herein stated.

There shall be no liability under this bond if, in the event of the acceptance of the Principal's Proposal by the City, either a performance bond or a payment bond, or both, shall not be required by the City on or before the 30th day after the date on which the City signs the Contract.

The Surety, for value received, hereby stipulates and agrees that the obligations of the Surety and its bond shall in no way be impaired or affected by any postponements of the date upon which the City will receive or open bids, or by any extensions of the time within which the City may accept the Principal's Proposal, or by any waiver by the City of any of the requirements of the Information For Bidders; and the Surety hereby waives notice of any such postponements, extensions, or waivers.

IN WITNESS WHEREOF, the Principal and the Surety have hereunto set their hands and seals and such of them as are corporations have caused their corporate seals to be hereto affixed and these presents to be signed by their proper officers the

_____day of_____19_____

(Seal)

_____(L.S.)
. Principal

(Seal) By_____

_____
Surety

By_____