92 N.Y.2d 20 (1998)
699 N.E.2d 368
677 N.Y.S.2d 9
A.H.A. General Construction, Inc., Respondent,
v.
New York City Housing Authority, Appellant.
Court of Appeals of the State of New York.
Argued April 30, 1998
Decided June 11, 1998.
Jeffrey Schanback, New York City, Henry Schoenfeld, Nancy M. Harnett and James R. Adolf for appellant.
Scotto, Georgoulis, Dockery & Scotto, New York City (Chris Georgoulis and Michael McDermott of counsel), for respondent.
Michael D. Hess, Corporation Counsel of New York City (George Gutwirth and Francis F. Caputo of counsel), for City of New York, amicus curiae.
Judges TITONE, BELLACOSA, SMITH, LEVINE, CIPARICK and WESLEY concur.
*23 Chief Judge KAYE.
This appeal centers on the notice and reporting requirements contained in two construction agreements between respondent (A.H.A. General Contracting, Inc.) and appellant (New York City Housing Authority). Seeking damages for extra work, respondent contends that the Housing Authority committed misconduct in its performance of the contracts, entitling respondent to recover despite its own noncompliance with the notice and reporting requirements. We conclude that because there is no showing that appellant's alleged misconduct in any way prevented or hindered respondent's compliance with those *24 contract requirements, appellant's summary judgment motion dismissing the complaint should be granted.

I.
In July 1990, the Housing Authority  a public benefit corporation that builds, operates and maintains housing for low-income individuals throughout New York City  publicly bid two Bronx construction contracts, one related to the rehabilitation of three buildings and the creation of park areas on Jennings Street (the Jennings contract) and the second to rehabilitation work on three buildings on Hoe Avenue (the Hoe contract). On October 5, 1990, the Housing Authority awarded respondent the Jennings contract for the price of $2,316,000 and the Hoe contract for the price of $2,410,000.
The Jennings and Hoe agreements include identical provisions regarding "extra work" (i.e., work other than that required by the contract at the time of its execution). Article 25 enables the Authority to order extra work and requires the contractor to perform it. When extra work is ordered, a change order detailing the nature of the job and providing a price increase for the labor is signed to compensate the contractor. As Article 25 states:
"Article 25. Extra Work. This Contract may be modified or changed by the Housing Authority from time to time, in a manner not materially affecting the substance thereof or increasing the price to be paid by more than ten (10%) percent of the contract price in order to carry out and complete more fully and perfectly the Work herein agreed to be done and performed. An order for Extra Work, shall designate the method of payment therefore, and shall be valid only if issued in writing and signed by the Housing Authority. Work so ordered must be performed by the Contractor."
The two agreements also contain notice and reporting requirements  i.e., requirements that respondent timely submit notices of claim and relevant documentation to reserve its right to receive payment for any extra work. These requirements enable the Authority to verify whether allegedly extra work is in fact beyond the scope of the contract, as well as the time, labor, material and cost involved. Article 27 sets forth the procedures to be followed in the event the parties disagree over whether certain work is within or beyond the scope of the original contract:

*25 "Article 27. Disputed Work. * * *. [I]f the Housing Authority determines that the Work in question is Contract Work and not Extra Work, or that the determination or order complained of is proper, he will direct the Contractor to proceed, and the Contractor must promptly comply. However, in order to reserve his right to claim compensation for such Work or damages resulting from such compliance, the Contractor must, within five (5) days after receiving notice of the Housing Authority's determination and direction, notify the Commissioner in writing that the work is being performed, or that the determination and direction is being complied with, under protest. * * *
"If the Contractor shall claim to be sustaining damages by reason of any act or omission of the Housing Authority or the City or its agents, he shall within five (5) days after such act or omissions occur, notify the Housing Authority in writing, and within thirty (30) days thereafter, or within such additional time in excess of thirty (30) days as may be granted by the Housing Authority upon written request therefor, submit to the Housing Authority verified detailed statements of the damages sustained together with documentary evidence of such damages. Upon failure of the Contractor to fully comply with the foregoing provisions, such claims shall be deemed waived and no right to recover on such claims shall exist."
Relatedly, Article 28 mandates that respondent furnish the Authority with daily written statements documenting the disputed work, as follows:
"Article 28. Performance of Extra or Disputed Work. While the Contractor or his Subcontractor is performing Extra Work ordered by the Housing Authority under Article 25 hereof (unless payment therefore is to be made by a lump sum or at unit prices previously agreed upon) or is performing disputed Work or complying with a determination or order under protest in accordance with Article 27 hereof, in each such case the Contractor shall furnish the Housing Authority daily with three copies of written statements signed by the Contractor's representatives at the site showing:

*26 "(1) the name and number of each workman employed on such Work or engaged in complying with such determination or order, the number of hours employed thereon, and the character of work each is doing; and
"(2) the nature and quantity of any materials, plant and equipment furnished or used in connection with the performance of such Work or compliance with such determination or order, and from whom purchased or rented. * * *
"Failure to comply strictly with these requirements shall constitute a waiver of any claim for extra compensation or damages on account of the performance of such Work or compliance with such determination or order."
Article 51 underscores the importance of the notice and reporting provisions. It precludes the contractor from asserting any cause of action against the Housing Authority without first "strictly" adhering to those provisions:
"Article 51. Claims and Actions Thereon. No claim against the City or the Housing Authority for damages for breach of contract or compensation for Extra work shall be made or asserted in any action or proceeding at law, or in equity, unless the Contractor shall have strictly complied with all the requirements relating to the giving of notice and of information with respect to such claims all as hereinbefore provided."
Further, the parties agreed in Article 31 that no estoppel would operate against the Housing Authority:
"Article 31. No Estoppel. Neither the Housing Authority, the City nor any department, officer, agent or employees thereof, shall be bound, precluded or estopped by any determination, decision, approval, order, letter, payment or certificate made or given under or in connection with this Contract by the City, the Commissioner, the Housing Authority, or any officer, agent or employee of the City or Housing Authority, either before or after the final completion and acceptance of the Work and payment therefor: (1) from showing the true and correct classification, amount, quality or character of *27 the Work actually done; or that any such termination, decision, order, letter, payment or certificate was untrue, incorrect or improperly made in any particular matter, or that the Work or any part thereof does not in fact conform to the requirements of this Contract; or (2) from demanding and recovering from the Contractor any overpayments made to him, or such damages as it may sustain by reason of his failure to perform each and every part of this Contract in strict accordance with its terms; or (3) both (1) and (2) hereto."
Finally, Article 64 of the Agreements is a merger clause:
"Article 64. Entire Agreement. This written agreement contains all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein."
Two months after the award, construction began. According to respondent, during the course of the projects (as was the case on their previous projects), the Housing Authority would direct respondent to perform extra work, the parties would negotiate a price, and the work would then be done with the expectation that a change order would be issued at the agreed-upon price. Some time later, claims respondent, the Authority would issue a change order in conformity with the parties' agreement authorizing an increase in the contract price. If, however, the parties could not agree upon the terms of the change order, respondent would submit correspondence to support its position that the work was not required by the contract and warranted additional compensation. The correspondence would serve as respondent's notice of claim and the claim would be resolved at a later date.
The Authority has a different recollection. It denies respondent's contention that, with respect to work that the Authority claimed was contract work but respondent contended was extra, the Authority permitted respondent to use correspondence as a substitute for the documentation required by the Agreements. By the express terms of the Agreements, argues the Authority, only when both parties agreed that an item of work was extra and when prior to the performance of the work the Authority ordered respondent in writing to perform the *28 work for an agreed sum, would respondent's obligation to submit daily reports be obviated.
What is undisputed, however, is that on two occasions, the Authority issued written change orders to respondent authorizing extra work in connection with the Jennings contract, but after respondent began performing the work the Authority rescinded the change order. First, on March 9, 1992, the Authority ordered respondent to fireproof all metal decks and structural steel at the Jennings sites as required by the contract. After starting the work, respondent submitted a cost proposal and on March 23, 1993, the Authority forwarded an unexecuted change order for the proposed price of $2,044. Soon thereafter, the change order was approved by both parties. On August 23, 1993, the Authority advised respondent that it had determined that the work covered by the change order was contract work and the change order was invalid.
The second time, on May 11, 1992, the Authority directed respondent to install ceramic wall and quarry floor tiles in the public halls and vestibules of the Jennings buildings and notified respondent that such work was contract work. Following respondent's commencement of the work, in March 1993 the Authority issued a change order and increased the contract price $13,115. Two months later, and with the stipulated construction tasks already completed, the Authority advised respondent that it was canceling the change order because the work covered by the change order was actually contract work.
After finishing its work under the contracts, on October 29, 1993 respondent presented the Housing Authority with verified notices of claim for purported extra work. In its notice of claim for the Jennings project, respondent asserted that after the contract was signed, the Housing Authority had produced additional drawings  not part of the original package  containing extra work that was performed by respondent. The Jennings notice added that respondent had made the Authority aware of any additional work it had performed through correspondence at various stages of the project. In the end, respondent characterized 18 tasks on the Jennings project as extra work for which it was allegedly entitled to additional compensation of $700,513.42 (more than 30% over the contract price). With respect to the Hoe contract, respondent claimed 14 extra items, totaling $205,126.34 (nearly 10% over the contract price). Respondent was ultimately paid $2,376,066 on the Jennings contract and $2,449,939.40 on the Hoe contract, reflecting adjustments for additional and omitted work. Respondent thereafter filed suit.
*29 Respondent asserted claims for breach of contract and unjust enrichment, seeking recovery for alleged extra work under the Jennings contract in the amount of $700,513.42 and under the Hoe contract in the amount of $204,931.34. Following joinder of issue, the Housing Authority moved for summary judgment on the grounds that respondent had waived its breach of contract claims by failing to comply with the contractual notice and reporting requirements  in particular Articles 27, 28 and 51  and that respondent's claims for unjust enrichment were barred by the existence of valid contracts covering the same subject matter.
In cross-moving for summary judgment, respondent charged that the Housing Authority had acted in bad faith by suggesting that respondent had not submitted documentation reflecting the extra work it had performed, by surreptitiously adding to the Jennings contract certain landscape and tile pattern drawings that did not bear approval stamps from the Department of Buildings (DOB) in an effort to obtain extra work without paying for it, and by unilaterally rescinding change orders for extra work. In denying respondent's allegations, the Housing Authority asserted that the landscape and tile pattern drawings were part of the original Jennings contract and that the absence of a DOB approval stamp from the drawings did not indicate bad faith. The Authority also disputed respondent's contention that the two rescinded change orders  which applied only to the Jennings contract and were issued after respondent had already commenced the work  excused respondent's noncompliance with the notice and reporting provisions.
Supreme Court granted the Housing Authority's motion and denied respondent's cross motion, holding that respondent had waived its breach of contract claims by failing to comply with the notice and reporting provisions and that the unjust enrichment claims were barred by the existence of an express agreement covering the same subject matter. Respondent, seeking reargument, claimed that the Housing Authority had not required it to comply with the notice and reporting requirements in prior contracts between the parties and that this departure from past practice constituted bad faith. The Authority responded that past practice should not be considered to vary the unambiguous terms of the contracts and that, in any event, with one exception, none of the other contracts between the parties had even contained Articles 27, 28 and 51. Supreme Court denied respondent's motion for reargument.
The Appellate Division modified Supreme Court's order by denying the Housing Authority's motion for summary judgment *30 and remitting the case for further proceedings (241 AD2d 428). As an initial matter, the Appellate Division agreed with Supreme Court that respondent's claims for unjust enrichment were foreclosed by the written contracts. It further agreed with Supreme Court that respondent did not comply with the notice and reporting requirements, but determined that these "exculpatory clauses" will not be enforced where "the contractee has acted in bad faith, or otherwise engaged in willful, malicious or grossly negligent conduct during its performance of the contract" (id., at 432). Because respondent had raised a genuine issue of fact as to the Authority's bad faith in performing the contracts, the Appellate Division denied the Authority summary judgment but certified to us the question whether its order was properly made. We now answer that question in the negative.

II.
Respondent undeniably failed to satisfy its notice and reporting obligations under the Agreements. Articles 27 and 51 strictly required respondent, when proceeding with disputed work, to submit contemporaneous statements and documentation of its actual damages, not proposed costs or estimates. Furthermore, Articles 28 and 51 strictly required respondent to submit daily reports detailing the name and number of workers engaged in the alleged extra work and information about materials, plant and equipment. The Authority's own daily construction site reports and respondent's submission of certified payroll reports  neither differentiating between contract work and disputed work  did not satisfy those requirements.
What, then, is the effect of respondent's failure to satisfy these contractual obligations?
The Appellate Division held that the notice and reporting provisions are exculpatory clauses. Exculpatory clauses immunize a party from liability for its own misconduct (see, Corinno Civetta Constr. Corp. v City of New York, 67 N.Y.2d 297, 309; Kalisch-Jarcho, Inc. v City of New York, 58 N.Y.2d 377, 384). However, unlike the "no-damage-for-delay" exculpatory clauses at issue in Corinno Civetta and Kalisch-Jarcho, Articles 27, 28 and 51 are not intended to absolve or exculpate the Housing Authority from liability, nor do they provide any rule of substantive contract liability. Rather, they require the contractor to promptly notice and document its claims made under the provisions of the contract governing the substantive rights and liabilities of the parties. They are therefore conditions *31 precedent to suit or recovery, not  as the Appellate Division held  exculpatory clauses (see, Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 690; Merritt Hill Vineyards v Windy Hgts. Vineyard, 61 N.Y.2d 106, 112-113; see also, Calamari and Perillo, Contracts § 11-5, at 439-440 [3d ed]).
That conclusion is legally significant. While an exculpatory clause will not be enforced when, "in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing" (Kalisch-Jarcho, Inc. v City of New York, 58 NY2d at 385, supra), the standard for excusing a condition precedent is different. A condition precedent is linked to the implied obligation of a party not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (Kirke La Shelle Co. v Armstrong Co., 263 N.Y. 79, 87). Thus, it is a "well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself" (Young v Hunter, 6 N.Y. 203, 207; see also, Arc Elec. Constr. Co. v Fuller Co., 24 N.Y.2d 99, 104; 3A Corbin, Contracts § 767, at 540 [1960]). Put another way, a party to a contract "cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition" (Kooleraire Serv. & Installation Corp. v Board of Educ., 28 N.Y.2d 101, 106; see also, Amies v Wesnofske, 255 N.Y. 156, 163; Patterson v Meyerhofer, 204 N.Y. 96, 100-101).
Thus, the relevant inquiry is not simply one of the Authority's bad faith or negligence in the performance of the contract but additionally whether the alleged misconduct prevented or hindered respondent's compliance with the notice and reporting requirements (see, Calamari and Perillo, Contracts § 11-28, at 486-489 [3d ed]). In ascertaining whether, as to that key question, there are material issues of fact warranting a trial, we of course must view the evidence in the light most favorable to respondent. Respondent's position that there are genuine triable issues centers on three matters. As is evident, however, all three lack any factual basis.
The Rescission of Two Change Orders. Respondent first argues that there is a material issue of fact in whether the Authority's rescission of two change orders caused or contributed to respondent's noncompliance with Articles 27, 28 and 51. Respondent fails to explain how the rescission of two change orders for $15,000 in any way prevented or hindered its ability *32 to comply with the notice and reporting provisions for its remaining claims, totaling nearly $1,000,000, or why these change orders for work on the Jennings contract might excuse noncompliance with notice and reporting requirements on the Hoe contract. Having proffered no proof that the Authority's rescission of two change orders in any way frustrated its required performance, respondent cannot rely on the change orders to defeat the Authority's summary judgment motion.
The record, moreover, makes clear that the Authority did not even issue the two change orders until after respondent had already commenced the work covered by them. In directing respondent to perform the work, the Authority informed respondent that this work was covered by the terms of the original contract. If respondent disagreed, it was contractually obligated to comply with the notice and reporting requirements during the time that had passed before the Authority issued the change orders. Certainly, respondent's failure to meet these requirements cannot be excused by later change orders.
The Inclusion of Additional Drawings. Respondent next points to the Authority's purported inclusion of drawings not originally in the contract as a ground for defeating summary judgment. Again, this is without basis.
Clearly, there is a dispute over whether certain drawings were part of the original Jennings contract. Respondent alleges that landscape drawings L-1 through L-4 for work on open spaces at the Jennings Street site and tile pattern drawing A-23 were not contract drawings, and that the Authority gave them to respondent only after the contract was signed in a bad faith attempt to obtain additional work without compensating respondent for it. The Authority, by contrast, submitted evidence indicating that respondent was well aware that these drawings were part of the original contract.[*]
*33 The existence of this conflict is, however, irrelevant for purposes of the summary judgment motion before us. Respondent fails to show how the conflict prevented it from doing what the contract required it to do  proceed with the disputed work mandated by the drawings and comply with Articles 27, 28 and 51. Again, there is no showing whatsoever as to how these drawings impeded respondent's ability to comply with contract requirements as to its claims of extra work.
Waiver Based on Past Practice. Finally, respondent contends that there is a triable issue as to whether the Authority waived respondent's compliance based on past practice between the parties but, again, this claim must be rejected as a matter of law. An alleged prior practice with respect to other agreements, of course, cannot override specific legal obligations undertaken by parties in later contracts. Nor can extrinsic evidence be introduced to alter, vary or contradict the clear and unambiguous terms of an integrated agreement (see, W.W.W. Assocs. v Giancontieri, 77 N.Y.2d 157, 162; Fogelson v Rackfay Constr. Co., 300 N.Y. 334, 338, 340). Articles 27, 28 and 51 (requiring strict compliance with the notice and reporting provisions), Article 31 (the estoppel clause) and Article 64 (the merger clause) are themselves a complete answer to respondent's arguments.
Those arguments are even further flawed. There is no showing in the record that the prior agreements contained the same requirements, and no showing that the alleged past practice was the same. Indeed, in its reargument motion, respondent alleged a past practice where, unlike here, the parties agreed that the work was extra and then negotiated over price. Apparently recognizing the problem, respondent now asserts that on prior projects the parties established a practice whereby respondent would perform extra work as directed by the Authority with the expectation that a change order would be issued or that price proposals submitted by respondent would constitute sufficient notice and documentation of its claim. There is simply no evidence in the record to support that assertion. As we have emphasized in the past, "mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient" to raise a material question of fact (Zuckerman v City of New York, 49 N.Y.2d 557, 562).
Strong public policy considerations favor scrutiny of claims of bad faith when offered by contractors to excuse noncompliance with notice and reporting requirements in public contracts. These provisions, common in public works projects, *34 provide public agencies with timely notice of deviations from budgeted expenditures or of any supposed malfeasance, and allow them to take early steps to avoid extra or unnecessary expense, make any necessary adjustments, mitigate damages and avoid the waste of public funds. Such provisions are important both to the public fisc and to the integrity of the bidding process. Respondent's accumulation of $1,000,000 in undocumented damages  a full 20% over the combined contract price  is precisely the situation that the cited provisions are intended to prevent.
There having been no showing that the Housing Authority's alleged misconduct impaired respondent's ability to fulfill these contractual undertakings, and there being no merit in respondent's remaining contentions, the Housing Authority's summary judgment motion should have been granted and respondent's complaint dismissed.
Accordingly, the order of the Appellate Division should be reversed, with costs, the order of Supreme Court, New York County reinstated, and the certified question answered in the negative.
Order reversed, etc.
NOTES
[*] The Authority demonstrated that the drawings are listed on the contract's indices of drawings; the cover page of the contract highlights that contract work includes the work mandated by the drawings; respondent received copies of these drawings prior to submission of bids as part of its bid package; and respondent had secured bid and performance bonds covering work proposed by the drawings. The Authority also submitted affidavits from Robert Biviano, the architect of record for the Jennings Street construction, who explained that the absence of a DOB approval stamp on the drawings did not indicate bad faith on the part of the Authority since the Authority was not required to submit landscape drawings or drawings involving aesthetic work  like the tile pattern drawing in question here  to the DOB for approval.