IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2026 Session

**SIGNAL PUMP, LLC D/B/A SIGNAL POWER v.
ARROW ELECTRONICS, INC.**

**Appeal from the Chancery Court for Hamilton County
No. 21-0487    Jeffrey M. Atherton, Chancellor**

---

**No. E2024-01376-COA-R3-CV**

---

This appeal concerns an unsuccessful business relationship between two companies. Signal Pump, LLC ("Signal"), a company that builds LED light towers, contracted with Arrow Electronics, Inc. ("Arrow"), a major supplier of electronics components, for Arrow to become Signal's exclusive supplier. The relationship broke down as Arrow failed to timely supply Signal with parts and Signal failed to pay Arrow. Signal sued Arrow in the Chancery Court for Hamilton County ("the Trial Court") alleging, among other things, breach of contract and fraud. New York substantive law governed this lawsuit as provided for by the parties' agreement. Arrow filed a counterclaim against Signal for breach of contract based on Signal's alleged failure to fully compensate Arrow for its products and services. According to Signal, Arrow's failure to timely supply parts per the agreement cost Signal massive losses in profits it otherwise would have earned. Arrow, in turn, has asserted throughout that Signal continually changed its requests for parts. After a bench trial, the Trial Court found that both parties breached the agreement. The Trial Court awarded Arrow damages for Signal's failure to pay. However, the Trial Court declined to award Signal any damages for lost profits, citing a liability limitation clause in the parties' agreement. Signal appeals. We hold that the liability limitation clause is an exculpatory clause. We modify the Trial Court's judgment in that respect. Otherwise, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modified; Case Remanded**

D. KELLY THOMAS, JR., SP. J., delivered the opinion of the court, in which JOHN W. MCCLARTY, P.J., E.S., and KRISTI M. DAVIS, J., joined.

Phillip E. Fleenor, Chattanooga, Tennessee, for the appellant, Signal Pump, LLC.

Joseph Alan Jackson, II, Chattanooga, Tennessee, for the appellee, Arrow Electronics, Inc.

# OPINION

## Background

Signal is a Tennessee-based company that builds and sells hybrid LED light towers. Arrow is a major supplier of electronics components. Before 2016, Signal had purchased some parts from Arrow. In 2016, Signal and Arrow decided to greatly increase their business relationship. Under the envisioned plan, Arrow would become Signal's exclusive supplier of parts. Toward this end, the parties executed several documents. These documents formed the basis of Signal and Arrow's contractual relationship.

On September 14, 2016, the Note was executed. Under the Note, Arrow granted Signal an advance of up to $500,000 for consigned inventory. Arrow would be Signal's exclusive supplier to the extent the parts were available for purchase from Arrow or its affiliates. Interest was set at 8.5%, which could rise to 12.5% upon default. On September 19, 2016, the parties executed the Executive Summary. This document set out the parameters of the envisioned deal. Arrow would supply Signal with parts, assist with financing, and institute the CARES inventory system. The two parties were to agree on consigned inventory. On October 5, 2016, the Master Agreement was executed. This document, which contained an integration clause, set out the terms and conditions of the purchase and sale of goods. It also provided that the agreement could be terminated by either party on 90 days written notice. It provided further that Arrow and Signal were independent contractors and not part of a joint venture. Section 6 of the Master Agreement was a "liability limitation" clause, which stated:

> **LIABILITY LIMITATION** Notwithstanding anything to the contrary contained in this agreement, neither party will be liable under any section of this agreement, or under any contract, negligence, strict liability or other legal or equitable theory, for incidental, special, consequential or punitive damages, lost profits, lost business or cost of procurement of substitute goods or services.

(All capital letters in original). Also on October 5, 2016, the CARES Addendum was executed. This document incorporated the terms of the Master Agreement. Arrow would supply Signal with parts, and the parts supplied could be modified by agreement. Prices would be mutually agreed upon. Exhibit A was to be a parts list. However, it was not formally appended.

Delays in acquiring the necessary parts stalled the project. Signal and Arrow each point to the other as the primary reason for the failure of their contractual relationship. According to Signal, Arrow fraudulently led it to believe that it would supply Signal with

the parts necessary to make light towers and then failed to supply those parts. Signal points to emails by Arrow employees produced in discovery in which they expressed worry that they were driving Signal out of business with their delays. Signal also contends that it was overcharged by Arrow. On the other hand, Arrow contends that Signal changed its mind regarding the parts it needed, had poor prior relationships with suppliers, and was chiefly responsible for the failure of the endeavor.

In July 2021, Signal sued Arrow in the Trial Court alleging that it suffered millions of dollars in damages due to Arrow's failure to deliver necessary supplies per the agreement. In May 2022, Signal filed its Second Amended Complaint, the operative pleading. Signal alleged breach of contract; gross negligence; willful misconduct; reckless misconduct; fraud and fraudulent misrepresentation; and declaratory judgment/accounting. Signal argued that Arrow devastated its business by failing to supply the parts it needed. For its part, Arrow filed an answer and counterclaim alleging that Signal breached the contract by failing to fully compensate Arrow for its products and services. Trial took place over the course of five days in January and February of 2024. The parties agreed, as they had contracted for, that New York substantive law governed the case.

Charles Jackman ("Jackman"), former general manager of Arrow's Huntsville-based sales office, testified via video deposition. Jackman testified to meeting Signal President Doug Zukowski ("Zukowski") in 2016. With respect to the rate of markup, a contentious issue in this case, Jackman acknowledged an internal Arrow email in which he discussed a 15% markup on non-franchised parts. He did not recall sharing that email with Zukowski. On cross-examination by Arrow's trial counsel, Jackman testified to Zukowski's positive projections concerning Signal's growth. Zukowski forecast $8,000,000 in revenue in the second year, and $18,000,000 in the third year. However, Jackman did not recall specific details as to actual orders being placed.

Next was the video deposition of Joe Pace ("Pace"), a general manager for Arrow. Pace was Arrow's designated corporate representative. Pace testified to having sold various franchised and non-franchised parts to Signal, ranging from a nut to a light engine. With respect to Signal's allegation that Arrow overcharged it, Pace was asked what market value price meant under the Note. Pace answered that this depended on multiple factors but agreed that it could mean the usual industry price at the time of purchase. Pace agreed that the Note provided for an 8.5% interest rate. He acknowledged that Signal had nevertheless been charged 9% interest. Pace then testified to the plan for replenishing Signal's inventory. The plan was for Signal's inventory to "turn" ten times per year. Pace said that there were some products Signal asked for that Arrow could not obtain. Given this, Arrow assisted Signal in purchasing the products needed. Pace was then asked about the CARES inventory system, which was supposed to be implemented by Arrow for Signal. He said that the material was "pipelined" but not implemented fully. According to Pace,

-3-

it "isn't unusual that it doesn't get implemented fully on day one, by the way."

On the issue of Arrow's inability to provide Signal with the necessary parts, Pace asserted that Signal kept changing the parts it wanted. Pace testified to a "bill of materials list" having been sent by Signal's Sophia Duran ("Duran") on October 4, 2016. Pace acknowledged that he was still working on the list some 41 days later. Pace testified to a problem whereby a product could not be sourced by a supplier because Signal had outstanding debt. Pace then acknowledged an internal email he sent in which he said that "we," as in Arrow, had been the cause of the delay but to "keep [this] between us." In another email concerning an issue with heat sinks, Pace said that he "can't accept the fact that we did not order when we should have for this delay we will literally put this guy [Signal] out of business and Arrow will be stuck with the inventory of other product for this build." Pace was also asked about an email from Arrow employee Joe Fisher ("Fisher") sent on February 10, 2017, several months after the agreement was executed between Arrow and Signal. According to this email, Signal was "dying on the vine since we [Arrow] still do not have enough inventory in consignment to start production on current backlog of 23 units." Fisher told Pace that Zukowski had called begging for help, and Fisher said he needed to tell Zukowski something.

Fisher, an Arrow field sales representative, testified next via video deposition. Asked about his saying Arrow was putting Signal "out of business," Fisher said that he was merely "expediting" to suppliers to get parts sooner. However, Fisher never told this to Zukowski. Pressed on this, Fisher acknowledged that the email was internal, not one sent to outside suppliers. Fisher was then asked about a January 23, 2017, internal email in which he said: "Doug has been waiting 6 months roughly for us to have inventory for him to start manufacturing the LED Towers and still does not have inventory to start production." In an emailed dated March 17, 2017, Fisher wrote: "He has 8 units assembled waiting for the light modules with 4 per unit so we need DROP DEAD 32 modules. If he does not ship these very soon he will lose this contract which are the protos for many more for NASA Parking lots."

Kristina Bell ("Bell"), former inside salesperson for Arrow, took the stand at trial. Bell had interactions with Signal's Zukowski and Duran. Bell acknowledged an internal email from March 16, 2017, in which she said that "the customer is unaware that we made any changes." In an email dated July 11, 2017, Bell wrote: "[H]ere are just a few highlights of the delays we have experienced for Signal over the last 8 months. It is has been a pretty painful process and a learning curve for sure." The email continued: "After multiple delays (including the heat sinks being changed without our knowledge by ETG, then not being on order, they were the wrong color when we received the first articles) we shipped our first 12 lights in May (enough to build three towers)." Bell's email said further: "Then when they tried to assemble them the power supply that we designed wouldn't work with the

lights."

Asked about her efforts to help Signal, Bell said that she had every incentive to get parts shipped to Signal. Otherwise, she would lose money. Bell stated further that she never received an accurate, full list of suppliers and parts from Signal. Asked why the parts list changed, Bell answered: "Because Signal continued to make changes to the building material, decided to change parts, decided to change vendors. Constant changes." Asked whether she wanted Signal to fail, Bell replied: "Absolutely not. Just the opposite. We needed him to succeed. We wanted him to succeed." Bell said that she had done the best she could. Bell was then asked about a change from Autec drivers to Moon drivers. Bell said that the only one who could change the part was Signal, as Arrow was not the designer. Bell testified to difficulties in securing the necessary parts for Signal:

> Q. Were there times that Signal approached suppliers without including Arrow?
> A. Yes.
> Q. After the master agreement?
> A. Yes.
> Q. Did that cause confusion?
> A. Yes.
> Q. Why did that cause confusion?
> A. Well, just like this, it says "he was requesting more parts to be made by us for their new motor."
> But I didn't know. I mean, from what I remember, I don't remember knowing anything about that.
> Same thing with Amtech. Amtech had a similar situation. We placed orders with Amtech only to find out that some parts had to come from MCA so he could build his cable. We didn't know that any parts had to come from another supplier for us to be able to purchase parts from Amtech.
> So it was just -- they had relationships before Arrow got involved, and they continued to go to those and tended to at times not include Arrow in those communications.
> Q. Did that cause confusion?
> A. Yes, since we are trying to purchase product on their behalf.
> Q. And did that cause doubling up on ordering of parts at times?
> A. At times.
> Q. Cause a slowdown again?
> A. Just more to sort through, yes.
> Q. And these are problems created by Signal; is that correct?
> A. That is correct.

Q. And if you -- take your time to read through it.

But what are some of these changes that were still being made in February of 2017?

A. It looks like they were changing -- Amtech was supplying some product so I would buy everything except. . .

There's some confusion on whether the electrical equipment was part of one Signal part number or another. There was some questions about some parts from MCA. Looks like we had changed to the Perkins motor at the time, and the Coliseum generator mount, and I was trying to confirm all these changes with Sophia.

Q. When you say there was confusion, why was there confusion?

A. Because some of the parts were being supplied to Amtech, and I thought -- I didn't realize that some of the parts were going to be supplied to Amtech from Signal.

Q. And that information wasn't provided --

A. Or Amtech will supply. Yes, it says Amtech will supply.

Q. And that information wasn't provided to Arrow before; is that correct?

A. No. That's correct.

Q. You also said that -- when you said, believe, we were making change to the -- to the engine, was that -- did you mean you were changing the list of the engine?

A. It looked like -- it just meant we are changing from the Honda to the Perkins. It mentions that in this e-mail.

Q. And when you use the word "we," that's a change that Signal made; is that correct?

A. That's correct, yes.

Q. You were just changing the parts list --

A. Correct.

Q. -- to try get a complete parts list?

A. Correct.

Bell then discussed her effort to get Arrow to extend Signal's draw date. Regarding the disputed issue of markups, Bell recounted having told Signal's Duran in July of 2017 that the markup rate was 15 to 16%. Bell testified that she thought Signal had a good product, but that the endeavor failed because of Signal. She cited Signal's delays, changes, and failure to pay. Bell said that Signal had not only failed to pay Arrow but had failed to pay its earlier suppliers as well. According to Bell, if Signal had supplied a final parts list, there would never have been a need to appear in court. On re-direct by Signal's counsel,

Bell said that she was unaware of ever sending Signal an email informing them that its requested changes were causing difficulties. Bell also acknowledged an exchange with Duran whereby the latter expressed confusion over the 15% markup rate. Bell told Duran that she believed the 15% figure was negotiated.

Zukowski, Signal's president, testified next. In 2016, Arrow approached Zukowski with the idea of taking over his supply chain. Prior to Signal's agreement with Arrow, Signal had a variety of suppliers for everything from tires to nuts and bolts. Despite initial hopes, Zukowski recounted delays in receiving products once the agreement with Arrow was underway. Zukowski testified that, before Signal and Arrow entered their contract, it cost $13,000 to build a hybrid tower. After the contract was executed, a hybrid tower cost $19,000 to build. Zukowski stated:

> We would never have entered into an agreement that caused our cost to go up 40 percent. It was -- it was a dramatic effect on our company. We were -- we were expecting prices to go down.
> And so here we are in a position that we did not get a full inventory turn for a year. We're expecting -- we are expecting to do over $10 million worth of business. Now we're not getting our product. Our cash flow has been destroyed. And now, when we finally get something to sell, the cost has gone up dramatically. So we've got a year of expenses just to run the company, and we're paying almost all of that to Arrow because the sales that we were able to salvage were based on prices that we expected and not this 30 to 40 percent increase.

Continuing his account of Signal's problems with Arrow, Zukowski testified that Arrow once represented to him that it could not buy from a certain vendor because its own internal practices would not allow it to. Zukowski testified further:

> Mr. Fisher was our primary contact. And it is a -- where is our stuff? And the e-mail was "it's coming."
> And as it -- as it drug on, it became, "Well, we've got a problem here, but it's coming. We're going to give you this $28,000 so you can start building."
> Well, it still wasn't coming. So it was this constant "it's coming," and it never came.
> If they had told us, if they had flat out said, "Doug, we've got a problem with your lights and you're not going to get lights till July," then we -- then we probably would have had a serious conversation about how do we fix this, how do we change this?
> I don't know any company that can go a year without significant

revenue. Just to pay your rent. And we're in this position. And it's this constant Arrow not telling us the truth.

According to Zukowski, he begged friends and family for help in keeping Signal open.

Zukowski then testified to business opportunities Signal had with Lincoln Electric, a company that designs welders and generators. Zukowski identified a purchase order from Lincoln Electric for five units. Zukowski testified that Signal's overall loss in the failed transaction with Lincoln Electric was $55,000. Continuing his testimony, Zukowski acknowledged that Signal added parts that it requested Arrow to purchase over time. Zukowski explained: "We didn't represent that this was the only and final, nor did we ever represent to Arrow that we would never make -- I mean, to have an agreement that says we can never change, I hope I did not sign a document that said we could never change our model numbers." Zukowski also acknowledged that Signal had been behind in its payments to other suppliers. The testimony then turned to evidence for Signal's alleged damages. Zukowski testified concerning this as well as his understanding that Arrow would charge a markup. Zukowski stated, in part:

Q. In 2016 and 2017 we talked about -- you talked about some potential orders that you received from various companies. Do you remember testifying to that?
A. Yes.
Q. With Lockheed in 2016 and 2017, you had no written orders or POs associated with lighting towers or retrofit kits; is that correct?
A. Are you asking if I had a written purchase order?
Q. A written purchase order, written order, anything written that was ordering the retrofit kits or the towers from Lockheed.
A. We had the initial order for four. Those were the test units, and they were accepted. And then, after that, no.
Q. And you actually provided those four to them; is that correct?
A. Correct. That would have been approximately August 2016.
Q. No other written orders or POs from Lockheed in 2016 or 2017; is that correct?
A. That is correct. We did not accept any purchase orders because we could not deliver because Arrow did not provide us the lights that were promised.
Q. You actually informed Lockheed in late 2016 that you were unable to provide product to them; isn't that right?
A. Yes.
Q. NASA, did you -- you didn't have -- you had one written order or a PO for NASA for two lights, and those orders were fulfilled; is that correct?

A. Correct.

Q. Border Equipment, you never received a written PO or an order from them ever; is that correct?

A. Prior to our agreement with Arrow, we sold to Border. And then in 2020 we sold to Border.

Q. Did either of those instances have POs?

A. No.

Q. And in -- you informed Border in early 2017 that you couldn't provide any lighting towers or retrofit kits to them; is that correct?

A. Correct.

Q. Lincoln Electric, you had an order from them for four, and you fulfilled that order; is that correct?

A. No. We had an order for five, and we delivered one.

Q. And you canceled the remaining four; is that correct?

A. Lincoln canceled those.

***

Q. You knew before you entered into the master agreement that Arrow was going to mark up the parts; is that correct?

A. I knew that Arrow would make a profit.

Markup is -- can you explain what you mean by "markup"?

Q. When you entered into the master agreement, you weren't expecting Arrow just not to make any money off of this; is that correct?

A. Correct.

Zukowski was then shown the addendum to the Master Agreement. He acknowledged a clause stating that all "such purchases of products will be made at prices mutually agreed upon by customer and Arrow from time to time." Asked why he did not terminate Signal's agreement with Arrow, Zukowski stated: "We were desperate at this time as a company. We just had to have parts, and we didn't want to object -- actually, we were being threatened with default by Arrow at this time. So they were literally threatening to seize our company."

At this juncture, Arrow moved to involuntarily dismiss under Tenn. R. Civ. P. 41.02(2). Arrow argued, among other things, that Signal had merely shown evidence of potential customers who thought about buying its product, as opposed to evidence of purchase orders lost because of anything Arrow failed to do. The Trial Court reserved ruling on Arrow's motion.

Pace of Arrow then took the stand. Pace stated that Signal's allegations that Arrow never intended to fulfill its duties under the contract were "absolutely absurd" because its success in the deal hinged upon Signal's success. Pace said that the issue was that Arrow never received a complete list of parts. Last to testify was Michael Fassula ("Fassula"), Arrow's senior manager of credit. Fassula testified that Signal had gone into default under the promissory note in early 2017. According to Fassula, Signal was frequently delinquent in paying Arrow. The total balance of Signal's debt was $581,774.44, which had since gone to collection agencies. Regarding interest under the Note, the standard rate was 8.5% and the default rate was 12.5%. Fassula testified that Arrow's charging Signal 9% interest was a clerical error amounting to $400. Nevertheless, Fassula stated that a 12.5% rate would have been justified given that Signal already was in default under the Note. Fassula testified that the clerical error cost Arrow money. On cross-examination, Fassula was asked why he requested to modify the Note in March 2017. Fassula testified:

Q. Why did you do that, please, sir? Why did you ask to modify the existing note?
A. Just give me a second.
Q. Sure. Absolutely.
A. (Reviews document.)
So let me take a step back. So the promissory note, when we initially did it, had a final draw date. So it had a time limit after which Signal would not be able to borrow monies under the note.
We were approaching that date, and my request to her was to modify the note such that we would allow them to draw more money.
Q. Why? What was the underlying reason that you needed to have the modification?
A. So that they could purchase inventory --
Q. Okay. And --
A. -- from a third party. I'm sorry.
Q. What was the reason that they needed to purchase from a third-party vendor?
A. So they -- let me read this.
Q. I'm not trying to be coy with you. I'll go over it with you.
You said "Arrow was unable to purchase all of the required nonfranchised material as we had committed, parenthesis, details below, close parenthesis, period. Since the original expectation was Arrow would procure 100 percent of material, the note currently is set up to pay for Arrow invoices"; is that correct, sir?
A. That's correct.
Q. Again, I'm not trying to be coy with you by any way stretch of the imagination. But the reason that the note needed to be extended was because

Arrow was unable to purchase all of the required nonfranchise material, correct, sir?

A. Yes, sir.

In August 2024, the Trial Court entered its final judgment. The Trial Court granted Arrow's motion for involuntary dismissal with respect to Signal's fraudulent inducement claim. The Trial Court also found Signal had failed to prove fraudulent concealment. Continuing with its ruling, the Trial Court found that both parties had breached the agreement. Nevertheless, the Trial Court found that the liability limitation clause in the Master Agreement precluded Signal from recovering lost profits. The Trial Court also found that there was insufficient evidence of purchase orders to prove Signal's alleged damages. Conversely, the Trial Court awarded Arrow $394,032.56 for its counterclaim against Signal based on the latter's failure to pay for products under the contract.[1] The Trial Court rendered a detailed oral ruling, a transcript of which was incorporated into the final order. It its oral ruling, the Trial Court found, in part:

> So we have the Plaintiff's Causes Of Action. This Court spent a lot of time reflecting upon a fraudulent inducement. Now, assuming that exists in this context under New York law, the plaintiff simply didn't put on the clear and convincing proof to support it. So please consider this the granting in part of the motion for involuntary dismissal on that sole issue. If the Court is in error, the [Court] finds and holds that the plaintiff failed to carry its burden on this issue and thus this claim fails.
>
> By way of specific findings of fact, before October 2016 both Mr. Zukowski and Signal were confident in his products, particularly the light tower. Arrow, as testified to by Mr. Pace as well as Mr. Fizzoula, was similarly confident in their ability to provide the materials to Mr. Zukowski or what Signal needed so that both would make a profit from the likely successful relationship.
>
> Things didn't go south be it in the forms of changing materials requests by plaintiff or an inability to timely supply or discovering inability to timely supply materials until after the operative documents were executed. Again, even if knowledge of the heat sink or engine changes are considered as existing in September of 2016, they were not shown to be of such importance to support a finding of fraud, misrepresentation, or fraudulent inducement.
>
> Thus, of the five elements of fraudulent inducement that identify that this Court's reading of New York law, be it misrepresentation, knowledge of

---

[1] The Trial Court found that Signal should be credited for $187,744.44 it paid to Arrow, thus reducing the $581,777 figure sought by Arrow.

the falsity of the representation when made, intent by the defendant to induce plaintiff to rely on it; justifiable reliance on the misrepresentation by plaintiff and, of course, injury and damages; at minimum plaintiff failed to carry its burden of Elements 2 and 3.

A completed and unchanging Exhibit A to Exhibit 12, the CARES agreement, prior to the execution of that agreement might have gotten the plaintiff to where they needed to be. Both parties conduct post-execution in the face of a to-be-provided identification in the document relating to the parts list simply doesn't support a finding of fraudulent inducement.

Somewhat more challenging may be the fraud or fraudulent concealment claim. In essence, to avoid the Mutual Liability Limitation in the master agreement in Exhibit 11, plaintiff has to meet the New York requirements of fraud, most of the elements of which are very similar to the fraudulent inducement discussion above.

Mr. Zukowski was adamant that he would not have entered into the agreement had he known that there would be product delays and changes in markups. But where the fraud claim fails and thus the plaintiff's ability to avoid the exclusive or mutual liability limitations provision is proof of the knowledge of the falsity of those statements when the statements were made, as well as the intent of the defendant for the plaintiff to rely upon those false statements to its detriment.

As noted above, although there is some proof such as with the drivers issue, the defendant learned of the issue and what is troublesome to me, failed to notify plaintiff about it. Those were technically after-the-fact representations that did result in delays but do not support a finding of fraud.

As a result plaintiff's claims of fraud and related misconduct characterized as gross negligence, willful or reckless conduct; and they do not give rise to the conclusion that the liability limitation in paragraph 6 of the master agreement doesn't control. This is therefore a contract case without tortification.

***

Both parties walked into the relationship with a to-be-determined parts requirement listing, Exhibit A to the Addendum, Trial Exhibit 12. So there is persuasive testimony and evidence supporting both parties' positions on the breach of contract issue.

So ultimately, did plaintiff carry its burden by a preponderance of the evidence that the defendant failed to materially perform its contractual obligations particularly with regard to timely supplying materials necessary

-12-

to manufacture the products necessary such that plaintiff could meet its obligation to its customers as well as the payment obligations to Arrow?

As a finding of fact based upon the witness testimony and any other facts noted by the Court above, as well as a conclusion of law, the answer is yes. . . .

\*\*\*

Defendant in its counterclaim asserted that plaintiff owes them $581,770, plus $280,000 in attorney's fees under the note and consistent with the terms of the contract. Plaintiff asserts that it is due between 7- and $10 million based upon certain lost profits. As noted above, and although the Court believes that the plaintiff did suffer significant lost profits -- I mean, let's face it. You charge $24,000 for a light tower and you make 75 percent profit on it. That's not a bad deal for Signal.

But proof of actual orders, not bids, not offers, but actual purchase orders exceeding $2 million or otherwise was an extremely short supply even if the Court were in a position to grant lost profits, which the Court has ruled it can't since they are specifically prohibited under the agreement between the parties.

\*\*\*

As has been noted, the Court is constrained to apply the mutual limitation of liability provision of paragraph 6 of the master agreement to preclude plaintiff's claim of lost profits or lost business opportunities, et cetera. Again, without this limitation, plaintiff's damages would be considerably different.

In addition, although the Court can not agree with defendant counsel's assertion during closing argument that Mr. Zukowski considered every offer a purchase order, the proof was somewhat limited concerning the actual orders that plaintiff had, and therefore the actual damages suffered versus the lost profits or lost business asserted are again what the court must consider.

So what the plaintiff's proof of actual orders lost as a result of a delay, not bids sent, not potential, but actual contract damages; well, I'll just rely upon the defendant's argument in closing argument because he said more than the plaintiff did. We're not just talking about the five units in his closing argument.

At the end of the day, and I guess this is what the parties want me to get to, the Court awards the defendant on its counterclaim the sum of $394,032.56. This represents essentially the $581,777 less the amounts

persuasively shown by the [plaintiff], namely $187,744.44 that were either actual losses or were payments that failed to be properly credited.

Signal timely appealed to this Court.

**<u>Discussion</u>**

We restate and consolidate Signal's issues as follows: 1) whether the Trial Court erred in rejecting the fraudulent inducement and concealment claims of Signal under New York law; 2) whether the Trial Court erred by not considering Signal's fraudulent inducement claims based on markups and interest rates; 3) whether the Trial Court erred by concluding that Section 6 of the Master Agreement was merely a limitation of liability clause, not an exculpatory clause; 4) whether the Trial Court erred by ruling that Arrow's gross negligence does not render the exculpatory clause unenforceable; 5) whether the Trial Court erred in failing to award significant lost profits to Signal as general damages that are the natural and probable consequence of Arrow's breach of contract; 6) whether the Trial Court erred in awarding Arrow $394,032.56 on its counterclaim; and 7) whether the Trial Court erred in not awarding punitive damages to Signal.

This is an appeal from a bench trial. We review a trial court's factual findings *de novo* with a presumption of correctness unless the evidence preponderates against them. Tenn. R. App. P. 13(d). On the other hand, we review a trial court's legal conclusions *de novo* without presumption of correctness. *Youree v. Recovery House of E. Tennessee, LLC*, 705 S.W.3d 193, 202 (Tenn. 2025). Likewise, the interpretation of written agreements is a question of law that we review without a presumption of correctness. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). Meanwhile, we defer to a trial court's credibility determinations absent clear and convincing evidence to the contrary. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014).

We first address whether the Trial Court erred in rejecting the fraudulent inducement and concealment claims of Signal under New York law. To recover damages for fraud under New York law, a plaintiff must "prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *610 Park 8E LLC v. Best & Co. Constr. Servs., LLC*, 65 Misc. 3d 1226(A), 119 N.Y.S.3d 704, at *2 (N.Y. Sup. Ct. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373 (1996)). "A party alleging fraud in the inducement bears the burden of proving each of the elements by clear and convincing evidence." *Hidden Pond Schodack, LLC v. Hidden Pond Homes, Inc.*, 189 A.D.3d 1792, 1795, 138 N.Y.S.3d 215, 219 (3rd Dept. 2020). Under New York law, the clear and convincing evidentiary burden "requires the party

bearing the burden of proof to present evidence that makes it highly probable that what he or she claims is what actually happened." *Matter of Sabastian N.*, 83 Misc. 3d 514, 527, 214 N.Y.S.3d 598, 608 (N.Y. Fam. Ct. 2024). Such evidence may not be "loose, equivocal or contradictory." *Id*.

Signal has alleged both fraudulent inducement and concealment on Arrow's part. To prove fraudulent inducement by affirmative misrepresentation under New York law, the following is required:

> (1) a false representation of material fact; (2) known by the speaker to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages (*see Schumaker v. Mather*, 133 N.Y. 590 [1892]; *Levy v. Bartfeld*, 2014 WL 1028714 [Sup Ct New York Cty 2014] ).

*Katehis v. Sovereign Assocs., Inc.*, 44 Misc. 3d 1220(A), 999 N.Y.S.2d 797 (Sup. Ct. 2014). In turn, fraudulent concealment requires:

> (1) an omission of a material fact; (2) intent to defraud; (3) duty to disclose, (4) reasonable reliance on the omission, and (5) damages suffered (*see Mandarin Trading Ltd. v. Wildenstein*, 16 NY3d 173, 178 [2011] ). The elements of fraudulent concealment are the same as the elements required for fraudulent misrepresentation with one addition-it must be shown that "the defendant had a duty to disclose material information and that it failed to do so" (*see P. T. Bank Central Asia v. ABN Amro Bank, N.V.*, 301 A.D.2d 373, 754 N.Y .S.2d 245 [1st Dept 2003] ).

*Katehis*, 999 N.Y.S.2d at 797. Signal also argues that Arrow possessed superior knowledge that it had a duty to disclose under the "special facts doctrine." The special facts doctrine has been described as follows:

> The "special facts" doctrine holds that "absent a fiduciary relationship between parties, there is nonetheless a duty to disclose when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair" (*Pramer S.C.A. v. Abaplus Int. Corp.*, 76 A.D.3d 89, 99, 907 N.Y.S.2d 154 [1st Dept. 2010]; *Jana L. v. West 129th St. Realty Corp.*, 22 A.D.3d 274, 277, 802 N.Y.S.2d 132 [1st Dept. 2005] ). As a threshold matter, the doctrine requires satisfaction of a two-prong test: that the material fact was information peculiarly within the knowledge of one party and that the information was not such that could have been discovered by the other

-15-

party through the exercise of ordinary intelligence (*Jana L.*, at 278, 802 N.Y.S.2d 132).

*Greenman-Pedersen, Inc. v. Berryman & Henigar, Inc.*, 130 A.D.3d 514, 516, 14 N.Y.S.3d 20, 21-22 (2015)

Signal contends that Arrow induced it into entering a contractual relationship without any intention of following through on its promise to supply Signal's needs. Signal contends further that the Trial Court erred by ruling that the absence of a finalized Exhibit A, or parts list, to the CARES Addendum meant that Signal could not prove fraudulent inducement. In further support of its argument that it was ensnared by Arrow's misrepresentations, Signal points out that the Note contained an exclusive buyer provision; that the CARES Addendum allowed for modification of the item list; and that Arrow communicated falsehoods to Signal before their agreement was reached. With respect to material omissions, Signal cites as an example of Arrow's alleged fraudulent concealment that "[b]efore the contracts were even signed, Arrow planned to substitute Signal's specified Autec brand LED driver with a Moons brand driver and to make the entire module an Arrow-driven design."

Initially, we observe that the Trial Court did not base its findings regarding fraud on the absence of a finalized Exhibit A. The Trial Court merely remarked that Signal's case might have been stronger had one existed. This observation by the Trial Court did not form part of its holding. In addition, the Trial Court found that the second and third elements of fraudulent inducement—knowledge of the falsity of the representation when made and intent by the defendant to induce plaintiff to rely on it, respectively—had not been proven. The evidence does not preponderate against the Trial Court's factual findings. The Trial Court's credibility determinations, both explicit and implicit, are entitled to deference as well. The record contains no evidence that Arrow knew in advance that it could not provide Signal with the necessary parts. On the contrary, the evidence reflects that Arrow was hopeful as to the success of its agreement with Signal, even though that did not pan out. What is more, Signal was not without recourse if Arrow could not supply parts, as the exclusive supplier provision applied only to the extent those parts were available from Arrow.

Even still, the record contains several damning emails whereby Arrow employees expressed an awareness that their failure to timely obtain necessary parts was harming Signal. However, while these emails reflect unfavorably on Arrow, they show Arrow's after-the-fact failure to perform under the contract rather than fraudulent inducement. Arrow's failure to fulfill its contractual obligations does not automatically demonstrate that it never intended to perform to begin with and only said it would to entice Signal to enter the agreement. "A fraud claim that is premised on alleged false statements of intention

will only succeed upon proof that the defendant made statements of intent that it knew would not be performed or with a present intention not to perform, and did so for the purpose of misleading the plaintiff." *In re Odonata Ltd.*, No. 22-10946 (MEW), 2023 WL 4239535, at *5 (Bankr. S.D.N.Y. June 28, 2023). We note further the Trial Court's finding that both Arrow and Signal breached the agreement, albeit in different ways. The Trial Court found that Arrow failed to deliver parts to Signal in time, failed to disclose, and failed to set up the CARES inventory system. As for Signal, the Trial Court found that it changed the parts it requested and failed to pay for materials when due.

Signal also alleges that Arrow fraudulently concealed information. Signal cites Arrow's substitution of Signal's Autec brand LED driver with a Moon brand driver. More broadly, Signal contends that Arrow secretly intended to make it switch to 100% Arrow product. However, the record does not bear this out. Nevertheless, even if this were so, Signal fails to explain how it would be inappropriate for Arrow to wish to supply its own preferred materials or why that would have been decisive as to Signal's entering into the agreement. The parties' agreement specified that it was not a joint venture, and the parties retained their own independent business interests and goals. As for the Moon drivers issue, the evidence reflects that Autec went out of business. The record reveals no special facts or knowledge withheld by Arrow injurious to Signal. The evidence does not arise to clear and convincing to sustain any of Signal's claims based on fraud. We affirm the Trial Court's rejection of Signal's fraudulent inducement and concealment claims under New York law.

We next address whether the Trial Court erred by not considering Signal's fraudulent inducement claims based on markups and interest rates. Signal states that Arrow wrongly charged it a 15% markup as part of "market value pricing" that was not provided for by the agreement. Signal also asserts that Arrow overcharged interest at 9% instead of the agreed upon 8.5%. With respect to the markup rate, the CARES Addendum stated that purchases would be made at prices mutually agreed upon by Signal and Arrow from time to time. Second, the evidence reflects that Signal knew markup was a part of the cost. Regarding the interest rate, Arrow acknowledges that it mistakenly charged Signal 9% interest instead of 8.5%. However, the record shows that Signal was already in default at the time the interest was charged and was subject to a 12.5% rate. Neither the rate of markup nor the interest rate charged to Signal lend any support to Signal's claim of fraudulent inducement. We affirm the Trial Court on this issue.

We next address whether the Trial Court erred by concluding that Section 6 of the Master Agreement was merely a limitation of liability clause, not an exculpatory clause. "Exculpatory clauses immunize a party from liability for its own misconduct." *A.H.A. Gen. Constr. v. New York City Hous. Auth.*, 92 N.Y.2d 20, 30, 677 N.Y.S.2d 9, 699 N.E.2d

-17-

368 [1998], *rearg. denied* 92 N.Y.2d 920, 680 N.Y.S.2d 461, 703 N.E.2d 273 [1998].  New York law provides:

> Generally, "courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities" (*U.S. Bank N.A. v. DLJ Mtge. Capital, Inc.*, 38 N.Y.3d 169, 178, 171 N.Y.S.3d 403, 191 N.E.3d 355 [2022] [internal quotation marks and citations omitted]). That said, public policy prohibits courts from enforcing exculpatory or nominal damages clauses to insulate parties from the consequences of their grossly negligent misconduct (*see Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 352, 141 N.Y.S.3d 410, 165 N.E.3d 180 [2020]; *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554, 583 N.Y.S.2d 957, 593 N.E.2d 1365 [1992]). Conduct rises to the level of gross negligence when it evinces a reckless disregard for the rights of others or intentional wrongdoing (*see Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d 377, 385 [1983]).

*Integrity Int'l, Inc. v. HP, Inc.*, 211 A.D.3d 1194, 1200, 180 N.Y.S.3d 320, 327 (2022); *see Matter of Part 60 Put-Back Litig.*, 165 N.E.3d 180, 187 (N.Y. 2020) ("[I]n a breach of contract case, grossly negligent conduct will render unenforceable only exculpatory or nominal damages clauses, and the public policy rule does not extend to limitations on the remedies available to the non-breaching party.").

Section 6 of the Master Agreement provides that "neither party will be liable under any section of this agreement, or under any contract, negligence, strict liability or other legal or equitable theory, for incidental, special, consequential or punitive damages, lost profits, lost business or cost of procurement of substitute goods or services."  Signal seeks damages for lost profits, which Signal puts at $2,380,000 in net lost profits.    The significance of the dispute over whether Section 6 is an exculpatory clause or a limitation of liability clause stems from the fact that, under New York law, grossly negligent conduct will render an exculpatory clause unenforceable.[2]  Signal argues that Arrow's conduct was

---

[2] The Supreme Court, Appellate Division, Second Department, New York has explained further as follows:

> As a general rule, a contractual provision absolving a party from its own negligence or limiting its liability is enforceable (*see Colnaghi, U.S.A. v Jewelers Protection Servs.*, 81 NY2d 821, 823 [1993]; *Sommer v Federal Signal Corp.*, 79 NY2d 540, 553 [1992]; *Melodee Lane Lingerie Co. v American Dist. Tel. Co.*, 18 NY2d 57, 69 [1966]; *Ciofalo v Vic Tanney Gyms*, 10 NY2d 294, 297-298 [1961]).  Nonetheless, the public policy of this State dictates that "a party may not insulate itself from damages caused by grossly negligent conduct" (*Sommer v Federal Signal Corp.*, 79 NY2d at 554; *see Colnaghi, U.S.A. v Jewelers Protection Servs.*, 81 NY2d at 823; *Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d 377, 384-385 [1983]; *Gross v Sweet*, 49 NY2d 102, 106 [1979]).

grossly negligent. In support of its contention, Signal relies heavily on the damning internal emails in which Arrow personnel discussed how their failures to act were putting Signal out of business. Arrow denies that its conduct arose to gross negligence.

Regarding Section 6, Signal argues that the clause is exculpatory because it effectively barred it from any recovery. Signal notes that the very purpose of its agreement with Arrow was to profit from the sale of products it made from Arrow-supplied parts, and the prohibition on lost profits totally undercuts its ability to meaningfully recover damages. In response, Arrow argues that the clause was not exculpatory because Signal could still recoup contractual damages under the contract. As an example, Arrow raises a hypothetical scenario in which it failed to deliver supplies that Signal paid for. According to Arrow, Signal could recover its damages in that scenario.

In a case concerning whether a contractual provision amounted to an exculpatory clause, the Court of Appeals of New York stated:

> Moreover, as a general matter, whether a contractual provision constitutes an exculpatory clause cannot depend upon a legal ruling this Court may make in some unrelated litigation at some unspecified point in the future. Such a rule could leave RMBS [residential mortgage-backed securitization] litigation in limbo indefinitely and would be destabilizing to the uniformity and predictability that is the foundation of New York contract law (*see Deutsche Bank Natl. Trust Co.*, 34 N.Y.3d at 342, 117 N.Y.S.3d 137, 140 N.E.3d 511). Instead, we examine the plain language of the contracts to determine whether the sole remedy provision was intended to immunize defendants from liability for a breach. We conclude that the sole remedy provision was not intended to exculpate defendants from liability for

---

Gross negligence "differs in kind, not only degree, from claims of ordinary negligence" (*Colnaghi, U.S.A. v Jewelers Protection Servs.*, 81 NY2d at 823). To constitute gross negligence, a party's conduct must " 'smack[ ] of intentional wrongdoing' " or "evince[ ] a reckless indifference to the rights of others" (*Sommer v Federal Signal Corp.*, 79 NY2d at 554, quoting *Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d at 385). Stated differently, a party is grossly negligent when it fails "to exercise even slight care" (*Food Pageant v Consolidated Edison Co.*, 54 NY2d 167, 172 [1981]) or "slight diligence" (*Dalton v Hamilton Hotel Operating Co.*, 242 NY 481, 488 [1926]; *see DRS Optronics, Inc. v North Fork Bank*, 43 AD3d 982, 986 [2007]; *Gentile v Garden City Alarm Co.*, 147 AD2d 124, 131 [1989]; *see also* PJI 2:10A ["Gross negligence means a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others"]).

*Goldstein v. Carnell Assocs., Inc.*, 74 A.D.3d 745, 746-47, 906 N.Y.S.2d 905 (2010).

-19-

> a breach but rather was intended by the parties to provide a remedy for the breach, albeit an exclusive one, that would make the Trust whole.

*Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 357. In *Empire One Telecommunications, Inc. v. Verizon New York, Inc.*, 26 Misc. 3d 541, 550, 888 N.Y.S.2d 714, 723 (Sup. Ct. 2009), a New York court characterized as an exculpatory provision a contractual clause specifically barring "indirect, incidental, consequential, [and] reliance" damages including "damages for lost profits." Thus, it was subject to being rendered unenforceable by gross negligence. *Id*. By contrast, in *Brink's Glob. Servs. USA, Inc. v. Bonita Pearl Inc.*, No. 22 CIV. 6653 (PGG), 2025 WL 1666303, at *25 (S.D.N.Y. June 12, 2025), the federal district court determined that a provision limiting a party's liability to the actual monetary value of the property lost up to the declared value "is not an exculpatory clause and does not limit customers' recovery to only a nominal sum. . . ."

Here, Signal argues persuasively that "[i]f Section 6 permits general damages but not general damages in the form of lost profits, then it, by definition, is an exculpatory clause to the extent it bars those damages in circumstances where the lost profits are the only general damages (other than nominal damages)." While Arrow puts forward a scenario in which Signal could recover damages for Arrow's failure to deliver supplies that Signal had paid for, that is a highly circumscribed scenario. Section 6 bars not only lost profits but lost business as well as cost of procurement of substitute goods or services. Arrow is shielded from liability for most conceivable forms of damages given the nature of the parties' agreement. Under Section 6, Arrow could effectively do nothing under the agreement and Signal would be barred from recovering damages. Since the whole point of the agreement was for Arrow to supply Signal with parts to build and sell light towers, preventing Signal from meaningfully recovering for Arrow's failure to fulfill its main contractual responsibility means that Arrow is effectively insulated from liability for its breach. *See Bridgestone Americas Tire Operations, Inc. v. Air Products and Chemicals, Inc.*, No. 4:23-cv-46-MJD, 2025 WL 1886668, at *14 (E.D. Tenn. Feb. 24, 2025) (Concluding that an argument that the seller in an exclusive supplier contractual relationship intended to bar its ability to recover any damages for the purchaser's failure to purchase would create an absurd result and nullify the heart of the parties' contract.).

In practice, Signal has been left completely without recourse whatsoever to say nothing of being made whole for Arrow's breach of contract. The Trial Court stated that it was "constrained to apply the mutual limitation of liability provision of paragraph 6 of the master agreement to preclude plaintiff's claim of lost profits or lost business opportunities, et cetera. Again, without this limitation, plaintiff's damages would be considerably different." The Trial Court thus acknowledged that, were it not for Section 6, Signal would recover damages for its lost profits. In the end, Section 6 served to bar Signal from recovering any damages for Arrow's breach of contract. We conclude that

Section 6 is an exculpatory clause. As such, it may be rendered unenforceable by gross negligence under New York law. We modify the Trial Court's judgment insofar as it characterized Section 6 of the Master Agreement as a limitation of liability clause rather than an exculpatory clause.

We next address whether Arrow's conduct arose to gross negligence to render Section 6 of the Master Agreement unenforceable. Signal argues that the Trial Court failed to rule on whether Arrow's conduct was grossly negligent and that this case should be remanded for the Trial Court to decide in the first instance. However, we disagree with Signal's interpretation of the Trial Court's order. We note the Trial Court's finding that "where the fraud claim fails and thus the plaintiff's ability to avoid the exclusive or mutual liability limitations provision is proof of the knowledge of the falsity of those statements when the statements were made, as well as the intent of the defendant for the plaintiff to rely upon those false statements to its detriment." The Trial Court found further that "plaintiff's claims of fraud and related misconduct characterized as gross negligence, willful or reckless conduct . . . do not give rise to the conclusion that the liability limitation in paragraph 6 of the master agreement doesn't control. This is therefore a contract case without tortification." While the Trial Court linked its discussion of Arrow's alleged fraud with the issue of Arrow's alleged gross negligence, we interpret the Trial Court's order to mean that it considered the question of whether Arrow's conduct was grossly negligent and determined that it was not. We therefore decline to remand and instead review the record to determine whether the evidence establishes that Arrow's conduct arose to gross negligence.

Under New York law, "[c]onduct rises to the level of gross negligence when it evinces a reckless disregard for the rights of others or intentional wrongdoing (*see Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 461 N.Y.S.2d 746, 448 N.E.2d 413 [1983])." *Integrity Int'l, Inc.*, 211 A.D.3d at 1200. In support of its contention that Arrow's conduct was grossly negligent, Signal points to the damning internal communications in which Arrow employees spoke about how they were putting Signal out of business. Indeed, these communications paint a troubling inside picture of Arrow's failure to fulfill its contractual duties to Signal. Nevertheless, these troubling displays did not amount to reckless disregard for the rights of others or intentional wrongdoing. We find no evidence of Arrow employees expressing or even intimating a desire to ruin Signal. On the contrary, Arrow employees appeared alarmed and dismayed by their failure to obtain the necessary parts. There are no emails showing, for example, that Arrow's warehouses were filled with necessary parts for Signal, but Arrow still would not ship them out. As found by the Trial Court, Arrow breached its agreement with Signal in part through its failure to timely supply parts, but there is nothing to show that these failures were a result of reckless disregard or conscious intention of wrongdoing. The evidence does not support that Arrow's conduct was grossly negligent, and Section 6 of the Master Agreement is an enforceable clause.

We next address whether the Trial Court erred in failing to award significant lost profits to Signal as general damages that are the natural and probable consequence of Arrow's breach of contract. In this issue, Signal again attempts to overcome Section 6 of the Master Agreement. Signal argues that it lost millions of dollars in money it otherwise would have earned but for Arrow's failure to supply it per their agreement. Signal says that these damages should be awarded irrespective of Section 6 as they stem from the heart of the agreement. Arrow, in turn, argues that Signal's damages are "lost profits" and consequential in nature, thus barred by Section 6. Arrow asserts further that Signal failed to trace its losses to any failings of Arrow. The Trial Court suggested in its oral ruling that, but for Section 6, Signal would be entitled to damages.

Regarding the distinction between general damages and consequential or special damages, New York law provides:

General damages "are the natural and probable consequence of the breach" of a contract (*American List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 43, 550 N.Y.S.2d 590, 549 N.E.2d 1161 [1989]; *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 [1989] ). They include "money that the breaching party agreed to pay under the contract" (*Tractebel Energy Mktg., Inc. v. AEP Power Mktg.*, Inc., 487 F.3d 89, 109 [2d Cir. 2007], citing *American List Corp.*, 75 N.Y.2d at 44, 550 N.Y.S.2d 590, 549 N.E.2d 1161). By contrast, consequential, or special, damages do not "directly flow from the breach" (*American List Corp.*, 75 N.Y.2d at 43, 550 N.Y.S.2d 590, 549 N.E.2d 1161).

"The distinction between general and special contract damages is well defined but its application to specific contracts and controversies is usually more elusive" (*id*.). Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are "the direct and immediate fruits of the contract" (*see Tractebel*, 487 F.3d at 109 n. 20, citing *Masterton & Smith v. Mayor of Brooklyn*, 7 Hill 61, 68-69 [1845] ). Otherwise, where the damages reflect a "loss of profits on collateral business arrangements," they are only recoverable when "(1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties" (*Tractebel*, 487 F.3d at 109, citing *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 [1986] ).

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 805-06, 11 N.E.3d 676, 680 (2014).

In *Bridgestone Americas Tire Operations, Inc. v. Air Products and Chemicals, Inc.*, the U.S. District Court for the Eastern District of Tennessee issued a memorandum and order addressing a somewhat similar issue to that of the present case. In *Bridgestone*, however, it was the supplier under an exclusive supplier agreement, rather than the purchaser, that sought its lost profits. New York law governed the parties' contract in *Bridgestone* as it does in the instant case. *Id*. at *8 n.8. Bridgestone, also referred to as BATO in the order, contracted to buy hydrogen exclusively from Air Products. *Id*. at *1. Bridgestone wished to expand, which affected its hydrogen needs, so it purported to terminate its contract with Air Products and went with another supplier. *Id*. Bridgestone sued Air Products seeking declaratory judgment that it properly terminated the contract, while Air Products countersued for breach of contract. *Id*. Both sides moved for summary judgment. *Id*. As relevant to the present appeal, one issue in *Bridgestone* concerned the effect of a limitation of liability clause on Air Product's ability to recover lost profits. The District Court ruled that, notwithstanding the clause, Air Products could still recover its lost profits stemming from Bridgestone's refusal to accept its product. The District Court noted authority standing for the proposition that, when contracts like the one in *Bridgestone* excluded consequential damages "including" lost profits, lost profits were only excluded insofar as they constituted consequential damages. *Id*. at *13. The District Court noted further that, under New York law, exculpatory clauses are strictly construed against the party attempting to avoid liability. *Id*. The District Court discussed as follows:

> BATO relies primarily on *Fresenius Kabi USA, LLC v. Hetero USA, Inc.*, 123 N.Y.S.3d 828 (N.Y. Div. App. 2020). In that case, the New York Supreme Court Appellate Division considered a limitation of liability clause similar to the one at issue in the instant case: "Except for indemnification obligations under this agreement, no party shall be liable to the other party for indirect, incidental, special or consequential damages arising out of performance under this agreement, including without limitation, loss of . . . profits[.]" *Id*. at 829. The plaintiff argued its lost profits were not barred by this provision because they were direct damages, not indirect, incidental, special or consequential. The court rejected the plaintiff's argument, finding "[p]lainly, recovery of the damages plaintiff seeks is barred by the parties' agreement," and that the plaintiff "has not provided a persuasive explanation for why the parties included the 'lost profits' language in the limitation of liability clause if they did not intend to preclude the recovery of lost profits." *Id*.

While *Fresenius* would seem to support BATO's position on summary judgment, the opinion is devoid of analysis. Further, as described by Air Products in its response to BATO's motion, the *Fresenius* decision is distinguishable on the facts [see Air Products Response at p. 13-14 (Doc. 63)]. In *Fresenius*, the defendant agreed to manufacture and supply a generic drug, which the plaintiff was to "commercialize" [Air Products Response, Ex. A at p. 9 (Doc. 63-1)]. The plaintiff agreed to pay a fee to the defendant for the license to sell the drug, which fee was based on sales of the drug. According to the plaintiff, the defendant unilaterally withdrew the drug from the FDA approval process and ceased manufacturing it. The plaintiff then sued to recover for the amounts it would have received in selling the drug to third parties [*see* Air Products Response Ex. A, Ex. B, Ex. C (Doc. 63-1; Doc. 63-2; Doc. 63-3)]. By contrast, the "lost profits" Air Products seeks are based on the sales of hydrogen to BATO under the terms of the Contract, not to third parties. Ultimately, the Court is not persuaded that *Fresenius* should be applied in the manner advocated by BATO, that is, to bar Air Products from receiving its direct "lost profits." The clear weight of authority, including the cases cited by Air Products, demonstrates otherwise.

Finally, and relatedly, BATO argues that the distinction between direct and indirect damages is one without a difference because the Parties used the phrase "loss of profit." In addition to ignoring the aforementioned authorities, BATO's argument requires this Court to conclude that Air Products intended to bar its ability to recover any damages for BATO's failure to purchase hydrogen under the Contract. This argument would create an absurd result and nullify the heart of the Contract. In its briefing and during the hearing, BATO emphasized the profit Air Products made on equipment-related charges in the later years of the original Contract term, after the original equipment had been fully amortized. But BATO fails to adequately address that this is precisely the arrangement to which the Parties agreed, and an amount BATO willingly paid for years without ever requesting a change in pricing.

The Court therefore holds that the Limitation Provision does not bar Air Products' claim for monetary damages which flow directly from BATO's breach of the Contract. This includes Air Products' damages for the lost profits related to the sale of hydrogen molecules, which Air Products bargained for and which are undoubtedly "the direct and immediate fruits of the contract." *Biotronik*, 11 N.E.3d at 680.

*Bridgestone*, 2025 WL 1886668, at \*13-14 (footnote omitted). By contrast, the District Court held that Air Products could not recover damages for profits it would have made on equipment it had proposed to install under the expansion, referring to these as 'speculative profits.' *Id*. at \*14. With respect to these damages, the District Court found they could not be recovered under the limitation of liability provision. *Id*.

The *Bridgestone* case is superficially helpful to Signal's position as persuasive authority, but the circumstances are dissimilar in multiple ways. In *Bridgestone*, the damages sought stemmed directly from the contract. In the present case, Signal's alleged damages stem from Arrow's failure to timely deliver parts, which in turn resulted in Signal's prospective purchasers being unable to buy from Signal. In other words, third parties are implicated in Signal's damages. The damages in *Bridgestone* arose under the contract itself. Signal's alleged damages of lost profits do not flow directly from the contract; they relate to interactions with third parties. This being so, Signal cannot avoid Section 6 of the Master Agreement, which clearly bars the recovery of lost profits, lost business, and cost of procurement of substitute goods or services. We find no ambiguity in Section 6; it explicitly bars recovery of the damages Signal now seeks. We find no reversible error in the Trial Court's decision to enforce Section 6 of the Master Agreement to bar Signal from recovering its lost profits.

We next address whether the Trial Court erred in awarding Arrow $394,032.56 on its counterclaim. To establish breach of contract under New York law, a plaintiff must prove the existence of a contract, a plaintiff's performance under the contract, a defendant's breach of the contract, and damages. *Liberty Equity Restoration Corp. v. Maeng-Soon Yun*, 160 A.D.3d 623, 626, 75 N.Y.S.3d 52, 55 (2018). On this issue, Signal says that this "amount directly corresponds to the sum that Signal Power had demonstrated was fraudulently charged by Arrow." Thus, Signal does not dispute the sum *per se*; it disputes that the amount is legitimately owed to Arrow. As discussed above, the record contains no evidence of fraud on Arrow's part. Under the agreement, purchases were to be made from time to time upon mutual agreement between Signal and Arrow. The parties had a valid agreement under which Signal would pay for parts provided by Arrow, and Signal failed to pay Arrow what it owed for these parts. Thus, we conclude that Signal breached its contract with Arrow by failing to pay for parts under the agreement. The evidence does not preponderate against the Trial Court's findings relative to this issue. The Trial Court did not err in awarding Arrow $394,032.56 on its counterclaim.

The final issue we address is whether the Trial Court erred in not awarding punitive damages to Signal. Regarding punitive damages, New York law provides:

> The bar for subjecting a defendant to punitive damages on a contract
> claim is high. Such damages are available only where "the fraud, aimed at

the public generally, is gross and involves high moral culpability," or when it "evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 [1961] ). Although "damages arising from the breach of a contract will ordinarily be limited to the contract damages necessary to redress the private wrong, . . . punitive damages may be recoverable if necessary to vindicate a public right" (*New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315, 639 N.Y.S.2d 283, 662 N.E.2d 763 [1995]; *see Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 634 N.E.2d 940 [1994] ). To state a claim for punitive damages in this context, a plaintiff must allege that "(1) [the] defendant's conduct [is] actionable as an independent tort; (2) the tortious conduct [is] of the egregious nature set forth in *Walker* . . .; (3) the egregious conduct [is] directed to [the] plaintiff; and (4) it [is] of a pattern directed at the public generally" (*New York Univ.*, 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763).

*Hobish v. AXA Equitable Life Ins. Co.*, 43 N.Y.3d 442, 453, 264 N.E.3d 223, 230 (2025).

We first note that Section 6 of the Master Agreement explicitly bars recovery of punitive damages. What is more, the threshold for punitive damages in a contractual setting is high under New York law. The Trial Court found that Arrow failed to deliver parts to Signal in time, failed to disclose, and failed to set up the CARES inventory system. This conduct, while constituting breach of contract by Arrow, in no way arises to the level of egregiousness necessary to sustain punitive damages under New York law. We also do not find that Arrow's failure to fulfill its contractual obligations was aimed at the public generally. Put simply, this is not a case amenable to punitive damages. We find no reversible error in the Trial Court's declining to award punitive damages to Signal.

## Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Signal Pump, LLC, and its surety, if any.

_____
D. KELLY THOMAS, JR., SPECIAL JUDGE

-26-